UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Friedman and Raphael
Argued at Richmond, Virginia

HUSSIN F. ABED ALI, S/K/A
  HUSSEIN ABED ALI

                                      MEMORANDUM OPINION[*] BY
v.      Record No. 1894-22-2          JUDGE CLIFFORD L. ATHEY, JR.
                                            MAY 28, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Edward A. Robbins, Jr., Judge

John B. Mann (John B. Mann, P.C., on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Hussin F. Abed Ali ("Ali") was convicted of abduction in violation of Code § 18.2-47

following a jury trial held in the Circuit Court of Chesterfield County ("trial court"). Ali contends,

on appeal, that the trial court erred by: 1) denying his motion to strike for insufficient evidence of

force, intimidation or deceit, or intent to deprive the victim of her personal liberty; 2) denying his

motion to suppress certain statements he made to investigators based on the trial court incorrectly

finding that he had validly waived his *Miranda* rights; 3) denying his motion to exclude all

statements made with the assistance of an interpreter; 4) refusing to allow him to play a video

recording of his custodial interrogation during cross-examination of the detective who conducted

the interrogation; 5) admitting hearsay testimony by the responding officer; and 6) giving an

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

incorrect and misleading definition of "personal liberty" to the jury upon the jury's request for a definition of that term. Finding no reversible error, we affirm the judgment of the trial court.

## I. BACKGROUND

Early in the morning of September 7, 2020, Fray Ovando ("Ovando") used his Lyft account to request a Lyft driver to transport M.C. from his residence to M.C.'s home in Hopewell. Ali responded to the Lyft ride request, arriving in his van at Ovando's residence around 2:30 a.m. Although M.C. was very intoxicated after a night of heavy drinking with Ovando, she was coherent and able to communicate when she got into the rear seat of Ali's van, expecting to be transported to her home. M.C. quickly fell asleep, but during the ride to her home she awakened and asked Ali to pull the van over so that she could vomit. As requested, Ali pulled the van over onto the shoulder of Interstate 95 for approximately six minutes while M.C. vomited outside the van. After vomiting, M.C. went back to sleep and was still unconscious when the van arrived at M.C.'s home about 3:26 a.m. When Ali arrived at M.C.'s home, he notified Lyft that the transport had been completed. Ovando then received a notification from Lyft informing him that the van had arrived at M.C.'s home and thus the ride had been completed.

Although Ali had reached the agreed destination, he drove off, transporting the still unconscious M.C. to the parking lot of a nearby church where the van remained for about four and a half minutes. While in the parking lot, M.C. awoke in the back seat of the van to find Ali "close to" her. When she awoke, her pants and underwear had "shifted" "like when you wear your pants on your hips" and "were just pulled down a little bit." M.C. immediately began striking Ali with her purse while demanding that he take her home. She continued to strike Ali with the purse even after Ali began driving her back to the agreed destination, her home.

When she arrived back at her home, M.C. ran from the van and collapsed on the floor inside of her house. She then began crying and screaming in front of her mother who had been awaiting

- 2 -

her arrival. M.C. eventually told her mother, Holly Barron ("Barron"), that the Lyft driver had sexually assaulted her. Barron then called 911 and reported the alleged sexual assault. Chesterfield County Police Officer Benjamin Viola ("Officer Viola") responded to the 911 call. He interviewed M.C. who advised him that Ali had "fondled" her buttocks when they stopped on Interstate 95. She further stated that when she awoke in the church parking lot, Ali was in the back seat with her and put his hand "towards her vaginal area." Law enforcement then engaged in a preliminary investigation which included the acquisition of Lyft records documenting the location of the van that night.

Based in part on the information obtained during the preliminary investigation, Chesterfield County Detective Kyle Easton ("Detective Easton") requested Ali's participation in an interview on October 13, 2020, at the Chesterfield County Police Department. Ali arrived at the police department for the interview accompanied by his brother-in-law. Detective Easton initially explained to Ali that he was not under arrest and that he could leave the interview whenever he wanted. Detective Easton also showed him that the door of the interview room was unlocked.

Detective Easton conducted the interview with Ali in English, later testifying that he did not perceive a language barrier. When needed, he rephrased some of his questions to Ali, and during the course of the interview, Ali's brother-in-law translated for Ali's benefit some of the detective's questions from English into Arabic prior to Ali answering. During the interview, Ali admitted that he was the Lyft driver who transported M.C. from Ovando's residence to M.C.'s home on the night in question. Ali told Detective Easton that M.C. was extremely intoxicated and confirmed that he had pulled the van onto the side of Interstate 95 to allow her to vomit. In addition, Ali further stated that upon arrival at M.C.'s home, he had exited the van and attempted but was unable to awaken M.C., who was asleep in the rear seat. When initially asked, Ali denied driving M.C. to the nearby church parking lot. Even after Detective Easton advised Ali that he possessed proof that Ali drove

- 3 -

the van to the church parking lot, Ali continued to deny ever going to the church parking lot that night either before or after reaching M.C.'s home. Ali further denied having intercourse with M.C. and answered all of the detective's questions during the interview in the English language with limited assistance from his brother-in-law. After the interview concluded, Ali and his brother-in-law left the police station together.

Later the same day, Detective Easton arrested Ali and conducted a second interview. Detective Easton began that interview by both reading Ali his *Miranda*[1] rights in English from a printed card and by explaining to Ali in greater detail the various *Miranda* rights he possessed. Although Ali questioned the meaning of the term "magistrate" and also asked about his right to counsel, he subsequently advised Detective Easton that he had no questions about his rights and continued the interview.

Detective Easton deemed it prudent to provide Ali an interpreter during the second interview and therefore called Language Line Solutions, a private company which provides translation services, and obtained an Arabic interpreter. During the second interview, a phone was placed in speaker mode and an Arabic interpreter translated Detective Easton's questions of Ali from English to Arabic and Ali's responses from Arabic to English. On some occasions, Ali directly answered the detective's questions in English without waiting to hear the Arabic translation of the question.

Ali confirmed at the end of the second interview that he did not want to correct any statements he had previously made during the first interview. Detective Easton again advised Ali that he had proof that Ali went to the church parking lot, whereupon Ali responded by claiming that the trip to the church parking lot was a second stop occasioned by M.C.'s need to vomit. Detective Easton then confronted Ali with documentation showing he drove to the church parking lot after the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

ride was terminated following the van's arrival at M.C.'s home. Ali responded to the documentation by stating, "I don't know."[2]

Ali was subsequently indicted for abduction with intent to defile, and following indictment, he moved to suppress his statements made during both interviews with Detective Easton. Ali contended that his statements should be suppressed because they were involuntarily made in violation of his right to counsel. He also asserted that because he did not adequately speak the English language, he could not have knowingly and voluntarily waived his Fifth Amendment right to remain silent. Finally, he argued that he had been intimidated and coerced by law enforcement into providing incriminating statements.

The trial court held a hearing on Ali's motion to suppress in which the court received recordings of both interviews as evidence. Subsequently, the trial court reviewed "every second" of these recordings. Ultimately, the trial court denied Ali's suppression motion because it disagreed with Ali's contention that he did not understand English. The trial court stated that after viewing nearly two hours of recorded interviews, it found "the defendant's fluency or proficiency in English to be fully adequate to communicate." The trial court further explained that although "[h]is proficiency in English may be described as imperfect . . . he clearly is able to communicate in English." In reaching its decision, the trial court also credited the testimony of Detective Easton "that he did not experience any language barrier" and "did not have a hard time speaking with" Ali as consistent with "the Court's observation of the near two hours of interviews." The trial court specifically noted that only "approximately three times" in the first interview did Ali's brother-in-law act as a "classic interpreter," meaning "hearing English, translated into Arabic, hearing the answer in Arabic, translating it back to English." The trial court also noted that Detective Easton and Ali scheduled the initial interview in English over the phone and that Ali understood English

_____

[2] Both the first and second interview were recorded.

well enough to arrive at the agreed place at the agreed time. The trial court also noted that Ali had been in the United States since 2009 and had worked for Lyft since 2017.

The trial court also concluded that Ali was not in custody for *Miranda* purposes during the first interview because Ali voluntarily came to the requested meeting, was told he was free to leave, and was not under arrest. Furthermore, the trial court noted that there were no outstanding warrants for his arrest and that he was not "in trouble" at the time. In support of its conclusion, the trial court also cited the facts that the detective did not use handcuffs or restraints during the interview and demonstrated the door was unlocked. Further, the trial court reasoned that Ali never asked to leave and left without complaint at the end of the interview. Thus, the trial court concluded that nothing about the first interview "was coercive to any material degree."

The trial court further concluded that *Miranda* applied to the second interview, stating "[c]learly *Miranda* is triggered in this [second] scenario, because shortly before the second interview the defendant was, in fact, arrested." The trial court also noted that Ali "was interviewed in handcuffs, so, quite clearly, *Miranda* applies to this second interview." However, the trial court also found that the detective adequately provided *Miranda* warnings prior to the second interview, noting that "[h]e didn't just read his pocket card[,]" but rather "[h]e would make a statement, perhaps, from his pocket card, but then he would elaborate, explain it a little more." The trial court also noted that, prior to the second interview, Detective Easton asked Ali if he understood each right individually, not just once at the end. The trial court further noted that Ali even asked questions, which the detective answered, concerning his right to counsel and about the magistrate. Moreover, the trial court noted that after explaining all of Ali's *Miranda* rights, the detective again asked Ali if he understood all his rights before beginning the second interview. Thus, the trial court opined "it is evident to [the court] that he did [understand]." Finally, the trial court noted that Detective Easton repeatedly asked Ali if he had any questions and Ali did not have any. As a result, based on those

findings, the trial court denied the motion to suppress Ali's statements during both the first and second interview.

Ali subsequently filed a motion *in limine* seeking to "bar the testimony of any statements made by the Defendant to any third party in Arabic which was later provided to Detective Easton . . . and which the Commonwealth intends to introduce at the trial . . . ." "The grounds of said motion [were] that the statements of these third parties are hearsay and should not be introduce[d] into evidence." At a hearing on the motion, Ali argued that "any questions that were interpreted by the individual and were answered by [Ali] would be clearly hearsay because we have that individual in the middle who is getting one thing—in one language telling this gentleman something else and he's responding there." He also argued that the interpreter needed to be formally qualified and sworn and that the failure for either of these two conditions to be met rendered the translations hearsay. Ali further argued that Code § 19.2-164 and Virginia Rule of Evidence 2:604 required the appointment of an interpreter for Ali before the second interview because at that point he had been charged and arrested.

The Commonwealth then stipulated that it would not attempt to enter into evidence any of the statements from the first interview objected to by Ali. However, the Commonwealth argued that the evidentiary rule against hearsay did not preclude admission of the statements translated by the interpreter during the second interview. The trial court denied the motion *in limine* holding that the statements at issue were not hearsay because the translator was not a declarant for purposes of the hearsay rule.

During the two-day jury trial, M.C. testified that she never wanted to go to the church parking lot and never agreed to go to the church parking lot. She stated that she awoke in the church parking lot and did not know whether Ali had gone to her home first before taking her to the church. When asked if she remembered if Ali had touched her, she responded "no."

On cross-examination she was asked if she had been assaulted on the side of Interstate 95 when they stopped because she needed to vomit; M.C. responded, "I don't know." Ali's counsel then asked, "[s]o you don't remember?" M.C. replied, "I remember throwing up outside of the vehicle and then going back to sleep." Ali's counsel clarified, "[y]ou don't remember any sexual assault that occurred on Interstate 95?" M.C. answered "[n]o."

Shortly thereafter, Ali's counsel asked, "Ma'am when you initially gave a statement to the police, you claimed two sexual assaults, did you not?" M.C. stated, "I don't remember." When prompted she explained, "I remember telling the police everything that I could remember at that point." Counsel then asked, "you testified today, one that you weren't sexually assaulted . . . on 95 when you threw up, correct?" M.C. responded affirmatively. Counsel then asked, "[t]he only thing you claim is . . . at the stop at the church, that you found your pants below where they should be?" She again answered affirmatively. And finally asked if she saw Ali "touching you at the time," M.C. answered, "[n]o."

On redirect, the Commonwealth's attorney addressed M.C.'s report to police and her memory of the night. When asked "is your memory different today than it was at the time," M.C. answered, "I remember different things. I remember—there are a few things that I remember the same then some things that I don't remember anymore, then other things that I'm recalling, and it's also been a long time too, and I've been trying to push this out." When asked what she meant about "trying to push it out," M.C. explained that she had "been trying not to think about it."

Barron testified that when M.C. arrived home that night, "[s]he was a mess." She testified that when M.C. came in "the front door," she "collapsed to the ground and started screaming and crying." Barron explained that she "immediately got off the couch and went over to find out what was wrong" and that M.C. told her "[t]hat she was kidnapped and that she was sexually assaulted."

Ali's counsel objected to this testimony as hearsay, but the trial court overruled it as an admissible excited utterance pursuant to Virginia Rule of Evidence 2:803(2).

Detective Easton testified as to his interviews with Ali. His testimony included both Ali's denial of going to the church and subsequent statement that he had gone to the church before ultimately arriving at M.C.'s residence. Officer Viola testified concerning statements M.C. made to him accusing Ali of touching her buttocks and moving his hands toward her vaginal area. Ali objected to these statements on hearsay grounds. The circuit court overruled the hearsay objections finding they were admissible hearsay exceptions as prior consistent statements.

Security videos of the church parking lot were played for the jury. These videos showed Ali's van enter the parking lot, park, and turn off the lights. After approximately four and a half minutes, the van's lights come back on, and the van drives away.

At the conclusion of the Commonwealth's case in chief, Ali moved to strike contending that the Commonwealth had not produced evidence of force, intimidation or deception sufficient to prove abduction. The motion to strike was also based on Ali's contention that the evidence failed to show he had ever deprived M.C. of her personal liberty. The trial court denied the motion to strike. Ali then called M.C. as his only defense witness and rested his case before renewing his motion to strike, which was denied again.

The jury was instructed that Ali was charged with "abduction for an immoral purpose." The instruction on this charge enumerated the four elements of that crime. The instruction also told the jury that if it found from the evidence that the Commonwealth had proven all the elements except that Ali possessed "the intent to sexually molest [M.C.]" that it should "find [Ali] guilty of abduction."

Following closing arguments, the jury retired to deliberate and subsequently made inquiries of the trial court during their deliberations. Initially, the jury advised the court that it could not

reach a verdict because it was deadlocked; in response, the trial court further instructed the jury using the *Allen*[3] charge. After resuming deliberations, the jury then requested further instruction on the definition of "personal liberty." Ali objected to the trial court providing any answer to the inquiry and insisted that the jury should rely upon the instructions already given. The trial court instead further instructed the jury that personal liberty is "the liberty of an individual to do his or her will freely except for those restraints imposed by law." The jury then returned to its deliberations, and Ali moved for a mistrial based upon the trial court's further instructing the jury on the definition of personal liberty over his objection. The trial court denied the motion for mistrial.

The jury subsequently convicted Ali of the lesser-included offense of abduction. The circuit court sentenced Ali to four years' incarceration. Ali appealed.

## II. ANALYSIS

A. *The evidence was sufficient to support Ali's abduction conviction.*

Ali contends that the evidence presented by the Commonwealth was insufficient to support a conviction for abduction because there was no evidence that he used force, intimidation or deceit to transport or confine M.C., nor was there any evidence that he intended to deprive M.C. of her personal liberty. We disagree.

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v.*

---

[3] *Allen v. United States*, 164 U.S. 492 (1896).

- 10 -

*Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)).  "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'"  *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'"  *Id.* (quoting *Kelly*, 41 Va. App. at 257).

"Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'"  Code § 18.2-47(A).  We have previously observed that "[t]his codification wholly 'super[s]edes the common law' and effectively combines the common law offenses of kidnapping, abduction, and false imprisonment 'into one statutory felony.'"  *Clanton v. Commonwealth*, 53 Va. App. 561, 567 (2009) (en banc) (quoting *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005)).  Thus, "[a] conviction under the abduction statute 'requires only a showing of "physical detention of a person, with the intent to deprive him of his personal liberty, by force, intimidation, or deception," without more.'"  *Id.* (quoting *Walker*, 47 Va. App. at 120).  "Abduction 'may be accomplished by a minimal amount of force and each case will depend upon the particular facts of the taking.'"  *Id.* at 574 (quoting *Stancil v. State*, 553 A.2d 268, 273 (Md. Ct. Spec. App. 1989)).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances."  *Commonwealth v. Herring*, 288 Va. 59, 75 (2014) (quoting *Howard v. Commonwealth*, 207 Va. 222, 228 (1966)).  Intent "may, and often must, be inferred from the facts and circumstances in a particular case.  The state of mind of an alleged offender may be shown by his acts and conduct."  *Ridley v. Commonwealth*, 219 Va. 834, 836 (1979).  "[T]he factfinder

determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017).

Ali contends that since M.C. voluntarily entered the vehicle and then failed to exit it, his driving beyond her destination cannot constitute "force" within the meaning of the statute.[4] However, force may be "minimal" and "each case will depend upon the particular facts of the taking." *Clanton*, 53 Va. App. at 574 (quoting *Stancil*, 553 A.2d at 272). This Court has quoted with approval the Maryland intermediate appellate court's observation regarding Maryland's abduction statute when evaluating a claim that an infant carried away from a hospital bed by the defendant had not been taken forcefully:

> [i]f we were to follow appellant's reasoning to its logical end, children, incompetents, physically handicapped and the unconscious would not be protected by the statute if they did not resist in any manner or smiled as they were taken from their beds. It would ill serve the law to exclude as kidnappers those who prey on persons who cannot resist.

*Id.* (alteration in original) (quoting *Stancil*, 553 A.2d at 273).

Here, an unconscious woman was taken to an unwanted location after arriving at the agreed destination. The evidence reflects that after arriving at the agreed destination and discovering that M.C. was unconscious and unaware that she had arrived, Ali decided to take her to another location to which M.C. had never agreed. Hence, after M.C.'s safety was entrusted to Ali as a driver for Lyft, Ali acted as if he possessed a license to transport M.C. wherever he pleased even after reaching the agreed destination and ending the Lyft ride. In addition, the totality of the circumstances including that M.C. was unconscious, intoxicated, and unaware that she had reached

---

[4] Ali also argues there was insufficient evidence that he used either deception or intimidation in taking M.C. to the church. Since we find there is sufficient evidence that he used force to accomplish the taking, we need not address whether intimidation or deception were present.

her destination also supports the jury's conclusion that the evidence met the degree of force required to support Ali's conviction for simple abduction. We cannot find a meaningful difference between the minimal force required to carry an infant from its bed and the minimal force required to drive a van with an unconscious adult in the back seat. *Stancil*, 553 A.2d at 273. We will not "limit the application of the abduction statute to the taking or seizure of only those persons who can comprehend such conduct and resist the taking." *Clanton*, 53 Va. App. at 574. Thus, the evidence that M.C. was, while unconscious, taken to the church parking lot, where she never agreed to go nor requested to be taken, was legally sufficient evidence of force being used to transport M.C., enabling the jury to find Ali guilty of abduction.

Next, Ali contends that there was insufficient evidence of his intent to deprive M.C. of her personal liberty because he only transported M.C. to the church parking lot to allow her to sober up so she could go home. In response to this contention, we find that the jury evaluated and rejected Ali's alternative hypothesis of innocence and that the jury's conclusion was supported by the evidence. First, in support thereof, the jury heard M.C.'s testimony that she never agreed to go to the church parking lot and awoke to find Ali in close proximity to her. Second, the jury heard testimony from Detective Easton that Ali denied ever going to the church at all, then subsequently claimed to have gone to the church on the way to M.C.'s home, not after reaching the destination. The jury was therefore entitled to weigh Ali's changing story as evidence of his guilt. *Black v. Commonwealth*, 222 Va. 838, 842 (1981); *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019). On these facts, we cannot say that the evidence was insufficient for the jury to infer that Ali had taken M.C. to the parking lot with the intent to deprive her of her personal liberty.[5]

---

[5] We note that this decision, like all decisions, rests upon the facts and circumstances of this particular case. We also submit that under the facts of this case, a reasonable fact finder could conclude that Ali harbored the necessary intent to deprive M.C. of her personal liberty required to support his conviction for abduction. However, we do not categorically hold that whenever a driver takes a passenger where they have not agreed to go, they are guilty of

- 13 -

Since the facts presented at trial permit a reasonable fact finder to conclude that Ali used force to transport M.C. to the church parking lot with the intent to deprive her of her personal liberty, we affirm the trial court.

B. *The trial court did not err by denying Ali's motion to suppress.*

Ali next alleges that the trial court erred by denying the motion to suppress his statements to law enforcement because he had not validly waived his *Miranda* rights prior to being interrogated by Detective Easton. Ali bases his contention on his alleged lack of knowledge of the English language which he alleges prevented him from understanding the *Miranda* warnings given him by Detective Easton. As a result, he asserts that he neither knowingly nor voluntarily waived his constitutional rights and the trial court therefore erred in denying his motion to suppress for that reason. We disagree.

On appeal, the appellant bears the burden to show that the court committed reversible error by denying his motion to suppress. *Secret v. Commonwealth*, 296 Va. 204, 224 (2018). "Whether the circumstances of [a police interview] were such as to require *Miranda* warnings is a mixed question of law and fact." *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019). Appellate courts "review such questions de novo but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them." *Id.*

---

abduction. In evaluating any case, each element must be proven, and it may happen that cases will arise in which a driver presented with a similar situation to that encountered by Ali, may transport their passenger to another location without possessing the requisite intent to deprive the passenger of their personal liberty—perhaps, instead possessing another intent not actionable, for example an intent to seek medical aid for an intoxicated passenger. Whether the intent to deprive of personal liberty is present is and will always be a question for the finder of fact. In this case Ali's changing denials and subsequent explanation was not believed by the jury, and the facts were sufficient to support the jury inference that Ali intended to deprive M.C. of her personal liberty by transporting her to a church parking lot after arriving at their agreed destination.

Effective waiver of one's *Miranda* rights requires that the waiver be both knowingly and intelligently made and voluntarily given. *Tirado v. Commonwealth*, 296 Va. 15, 27-28 (2018). "The knowing and intelligent requirement of a *Miranda* waiver focuses on whether the defendant comprehended the plain meaning of the required warnings." *Id.* at 29. "[W]hether [the defendant] fully appreciates the beneficial impact on his defense that silence may have—whether he fully understands the tactical advantage, in our system of justice, of not speaking—does not affect the validity of his waiver." *Id.* (alterations in original) (quoting *United States v. Yunis*, 859 F.2d 953, 964-65 (D.C. Cir. 1988)).

Ali contends that he did not understand the *Miranda* warnings read to him in English well enough to enable him to knowingly waive his rights. Ali's capacity to understand English is a question of fact. Here, the trial court reviewed the entirety of the recorded interviews and expressly found Ali's "fluency or proficiency in English to be fully adequate to communicate." Hence, although the trial court acknowledged that Ali's "proficiency in English may be described as imperfect," more importantly, it found that "he clearly is able to communicate in English." In further support of its ruling, the trial court noted that the first interview with Ali was conducted in English and that Ali's brother-in-law provided almost no aid as a translator. Also, Ali scheduled the interview over the phone with Detective Easton in English and arrived at the agreed place at the agreed time—further demonstrating his competency with English. Finally, the trial court relied on the fact that Ali had lived in America since 2009 and worked for Lyft in support of the conclusion that he could communicate in English. Thus, given our deferential standard of review when evaluating factual determinations, we cannot conclude that the trial court, upon these facts, erred in concluding that Ali understood English and made a knowing and intelligent waiver of his *Miranda* rights.

Turning our attention to whether Ali's *Miranda* waiver was voluntarily made, it is well settled that:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Tirado*, 296 Va. at 28 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "The 'test to be applied in determining voluntariness is whether the statement is the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired.'" *Id.* (quoting *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)). "In determining whether a defendant's will has been overborne, courts look to the totality of all the surrounding circumstances, including the defendant's background and experience and the conduct of the police." *Id.* (quoting *Gray*, 233 Va. at 324).

Ali's briefing on this issue provides little citation to any authority and largely comingles analysis of the knowingly and intelligently prong of the applicable test with the analysis of whether Ali's rights were voluntarily waived. Ali argues that his waiver was not voluntary because he did not speak or understand English well enough to voluntarily waive his rights. Although we must engage in de novo review of the legal question of whether or not a waiver was made voluntarily, in so far as his argument is based on his factual assertion that he failed to adequately speak English, his assignment of error is foreclosed here by the trial court's factual determination supported by the evidence that Ali was able to communicate in English.[6]

---

[6] Because the trial court found as a factual matter that Ali had a competent understanding of the English language, we need not address the specific arguments he makes regarding the

Ali also argues that Detective Easton "employed a number of devious and deceptive tactics to attempt to coerce a confession from" him. He first contends that Detective Easton's failure to advise Ali of his rights during the first interview followed by a second interrogation the same day constituted coercion. Ali provides no citation to any authority nor argument that two interviews on the same day constituted coercion that overbore his will. Ali then asserts that Detective Easton lied to him about having proof that a sexual assault occurred during the interrogation and that Detective Easton repeatedly told Ali he was a "good and honorable man." Again, Ali does not expand upon these bare assertions by citing any legal authority that such actions constitute coercion violative of his constitutional rights.[7] Our own review of the record is bereft of any unreasonable or coercive behavior on the part of law enforcement. Thus, we affirm the trial court's ruling that Ali voluntarily waived his *Miranda* rights when Detective Easton interviewed him.

C. *Ali failed to preserve his assignment of error regarding statements made by the interpreter during his custodial interrogation.*

Ali claims in his third assignment of error that the trial court erred by denying his motion *in limine* requesting that the trial court deny the admission into evidence of any statements made by the Language Line Solutions interpreter during his custodial interrogation. He also asserts that "the Commonwealth's use of a telephonic interpretation service for translation of [his] statement during

---

Commonwealth's not providing an interpreter when he was advised of his *Miranda* rights and refusing to allow him to contact his brother-in-law at that time.

[7] Ali only cites two cases in support of these assertions. The first is *United States v. Carriles*, 486 F. Supp. 2d 599 (W.D. Tex. 2007); Ali fails to note that the United States Court of Appeals, Fifth Circuit overturned this case. *United States v. Carriles*, 541 F.3d 344 (5th Cir. 2008). Regardless, his citation thereto is not germane; rather than supporting his bare assertions that Detective Easton's behavior had overborne Ali's will, the quoted language was a generalized statement that government actors must scrupulously follow the law. A worthy but superfluous exhortation here, where Ali failed to present any authority indicating that Detective Easton had violated a law. The other citation was to the entirety of *Maine v. Moulton*, 474 U.S. 159 (1985). He did not direct this Court's attention to any particular part of this opinion nor explain how it supported his assertions.

- 17 -

the second interrogation was a violation of [his] due process and Sixth Amendment constitutional right to counsel and was in violation of Virginia law." Since Ali failed to object to the ruling of the trial court denying his motion *in limine* on any constitutional ground, we decline to reach any related issues here. In addition, since Ali has failed to brief the assignment of error regarding the admission of the interpreter's statements as hearsay, Ali has waived that argument and we decline to reach it as well.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of the contemporaneous objection rule 'is to avoid unnecessary appeals by affording the trial judge an opportunity to rule intelligently on objections.'" *Maxwell v. Commonwealth*, 287 Va. 258, 264-65 (2014) (quoting *State Highway Comm'r v. Easley*, 215 Va. 197, 201 (1974)). "For the circuit court to rule intelligently, the parties must inform the circuit court 'of the precise points of objection in the minds of counsel.'" *Id.* (quoting *Gooch v. City of Lynchburg*, 201 Va. 172, 177 (1959)).

Ali argued to the trial court that the admission of the interpreter's statements would violate the rule against hearsay. Ali made no argument to the trial court that admission of the statements constituted violations of Ali's constitutional rights under the Fifth or Sixth Amendments. Since he failed to present those arguments to the trial court, they were not preserved for appellate review, and we will not consider them. Rule 5A:18. With respect to the hearsay argument actually presented in the trial court, Ali fails to address them in his brief, so they are also waived. Rule 5A:20.

D. *Ali's assignment of error asserting that the trial court erred by refusing to let him present the video recording of his custodial interrogation is procedurally barred.*

Ali next contends on appeal that because he had a right to impeach Detective Easton with the video recording of the interview which constituted the best evidence of the interview, the trial

court erred when it denied his request to play the video recording of the interview for the jury. We also decline to reach this assignment of error.

As stated above, Rule 5A:18 requires that "an objection [be] stated with reasonable certainty at the time of the ruling." "[W]hen a timely objection is made, a party may not later abandon that objection during trial and attempt to reassert the same objection on appeal." *Pick v. Commonwealth*, 72 Va. App. 651, 666 (2021) (alteration in original) (quoting *Graham v. Cook*, 278 Va. 233, 248 (2009)). "A party will be held to have waived a timely objection if the record affirmatively shows that he has abandoned the objection or has shown by his conduct the intent to abandon that objection." *Id.* (quoting *Graham*, 278 Va. at 248).

Here, Ali requested that the trial court allow him to play the video recording of his custodial interrogation to the jury. After some dialogue between the trial court and Ali's counsel, it was determined that Ali sought to impeach Detective Easton with respect to the number of times he told Ali he was an honorable man. Ali's counsel eventually agreed that the Commonwealth could stipulate that Detective Easton told Ali he was an honorable man "on multiple occasions." After some negotiation, the Commonwealth's attorney stated, "I will stipulate that three or four times, he said something to that effect, even if not those words." The trial court then asked Ali's counsel, "okay, will that work for you, . . . ?" And Ali's counsel responded, "That's fine." In the middle of that exchange, Ali's counsel also stated that the video recording of the interview was the best evidence; the trial court immediately countered that best evidence only applied to writings. Ali's counsel said nothing further regarding the best evidence rule.

This exchange demonstrates that Ali made no objection to the trial court's ruling and agreed to the stipulation offered by the Commonwealth as an acceptable substitute for playing the video recording for the jury. After the Commonwealth rested, the trial court revisited the issue, noting that Ali was impeaching Detective Easton as to the number of times he told Ali he was a good and

honorable man. The trial court stated, "[Detective Easton] acknowledged having said that, the number is in dispute, but the stipulation is that he said that or substantially similar to that on multiple occasions, and if that's true, I think for impeachment purposes, it's complete." The trial court told Ali's counsel, "[i]f you disagree, with the Court's analysis, I need you to tell me why the impeachment is incomplete. If you have the stipulation, he's going to say I said it at least once, the stipulation is he said that or something like that on multiple occasions," "and so from the Court's perspective, the impeachment is complete; it doesn't square up with the testimony." Ali's counsel responded, "That's fine."

Here, the trial court never ruled on Ali's request to play the video recording for the jury because Ali abandoned any effort to do so. Therefore, Rule 5A:18's contemporaneous objection requirement is not satisfied. Further, insofar as some objection could be construed from the record, it is clear that Ali abandoned it. Accordingly, we will not consider this assignment of error.

     E. *The trial court erred in allowing Officer Viola to present hearsay testimony, but the error was harmless.*

Ali next contends that the trial court erred by admitting in evidence Officer Viola's testimony relating statements made to him by M.C. indicating that Ali had touched or attempted to touch her sexually. We conclude that although the admission of this hearsay testimony was in error; the error was harmless.

The "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado*, 296 Va. at 26). Generally, out of court statements offered for the truth of the matter asserted are inadmissible. Va. R. Evid. 2:802. However, Rule of Evidence 2:801 allows for the admission of certain prior consistent statements:

> (d) *Prior statements*. When a party or non-party witness testifies either live or by deposition, a prior statement (whether under oath or not) is hearsay if offered in evidence to prove the truth of the matters

- 20 -

it asserts, but may be received in evidence for all purposes if the statement is admissible under any hearsay exception provided in Rules 2:803 or 2:804. In addition, if not excluded under another Rule of Evidence or a statute, a prior hearsay statement may also be admitted as follows:

. . . .

(2) Prior consistent statements. A prior statement that is consistent with the hearing testimony of the witness is admissible for purposes of rehabilitating the witness' credibility, but only if

(A) the witness has been impeached using a prior inconsistent statement as provided in Rule 2:607, Rule 2:613 and/or subpart (d)(1) of this Rule 801, or

(B) (i) the witness has been impeached based on alleged improper influence, or a motive to falsify testimony, such as bias, interest, corruption or relationship to a party or a cause, or by an express or implied charge that the in-court testimony is a recent fabrication; and

(ii) the proponent of the prior statement shows that it was made before any litigation motive arose for the witness to make a false statement.

Here, we need not determine whether the circumstances described in Rule 2:801(d)(2)(A) and Rule 2:801(d)(2)(B) are present. Although Rule 2:801(d)(2) expressly allows for admission of a "prior statement that is consistent with the hearing testimony of the witness," M.C. testified at trial that she could not recall any sexual assault or touching of any kind. Hence, the prior hearsay statements admitted through Officer Viola were not consistent with M.C.'s testimony at trial. Thus, the statements were not admissible pursuant to Rule 2:801(d)(2), and the trial court erred in concluding that they were.

However, upon finding error, our analysis is not complete. Before determining whether error is reversible, Code § 8.01-678 requires us to engage in harmless error analysis. "A non-constitutional error is harmless when it 'plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Anderson v. Commonwealth*, 282 Va. 457, 466 (2011) (quoting *Rose v. Commonwealth*, 270 Va. 3,

- 21 -

11-12 (2005)).  "In a criminal case, if 'the alleged error substantially influenced' the finder-of-fact, the error is not harmless."  *Id.* at 466-67 (quoting *Clay v. Commonwealth*, 262 Va. 253, 259 (2001)).  "If, when all is said and done," we can be sure "that the error did not influence the jury, or had but slight effect, the verdict and judgment should stand . . . ."  *Id.* at 467 (alteration in original) (quoting *Rose*, 270 Va. at 12).  "To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict."  *Commonwealth v. Kilpatrick*, 301 Va. 214, 217 (2022).

The objectionable testimony recounted statements allegedly made by M.C. to Officer Viola in which M.C. described actions that may have constituted some form of sexual assault.  Here, Ali was indicted and tried by a jury for abduction with intent to defile; however, the jury convicted him only of the lesser-included offense of abduction.  We find here that the evidence supporting a conviction for simple abduction was clear and overwhelming.  The evidence properly admitted at trial reflected that Ali agreed to transport M.C. to her home.  Instead of transporting M.C. to her home as agreed, he arrived at her home and then provided notice to Lyft that he had arrived at the agreed destination.  Ali then chose to drive her to a nearby church parking lot when she was unconscious and could not have consented to being transported to another destination.  The evidence further reflected that Ali initially lied to law enforcement during his first interview by denying that he ever transported M.C. to the church parking lot.  During his second interview later the same day, after being confronted with evidence that he did in fact transport M.C. to the church parking lot, Ali stated that the trip to the church parking lot was a detour to permit the victim to vomit a second time before reaching her home destination.

Although the dissent acknowledges that the evidence of guilt of the lesser-included offense of abduction is sufficient, the dissent contends that the evidence of guilt is not overwhelming because the jury may have been influenced by Officer Viola's inadmissible hearsay testimony

- 22 -

which may have "cast suspicion on [Ali's] general intent and character." Thus, the dissent reasons that "a suspicion of prurient interest could be relevant to abduction even if the jury found the evidence fell short of proving an intent to defile." The dissent similarly reasons, "the jury could have concluded that an intent to touch did not encompass an intent to defile—but could still constitute an intent to deprive M.C. of her personal liberty to be free of unwanted contact."

Although we acknowledge the concerns raised by the dissent, given the overwhelming admissible evidence in support of Ali's abduction conviction, the majority concludes that the hearsay statements admitted in error were insignificant to and could only have had slight effect on the conviction of Ali for abducting M.C. To conclude that a non-constitutional error is harmless "the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict." *Kilpatrick*, 301 Va. at 217. Again, the properly admitted evidence reflected that Ali, a Lyft driver, who had accepted a fare to deliver M.C. to a specific destination, arrived at the destination and then transported an unconscious woman to a vacant parking lot in the middle of the night. The jury could have reasonably inferred intent by simply deciding that there was no reasonable basis to take an unconscious passenger to a vacant parking lot in the middle of the night. This inference is particularly reasonable in light of the admitted evidence that Ali ended the Lyft service upon arrival at M.C.'s home. The ending of the Lyft service and transporting M.C. to a vacant parking lot late at night, taken together are highly probative of an intent by Ali to deprive M.C. of her personal liberty. However, we also have evidence of Ali's lying and offering inconsistent explanations to law enforcement concerning his whereabouts that night. Thus, his efforts to cover up his true activities that night as contradicted by the GPS data reflecting both the order and location of his stops also support the jury's verdict convicting him of abduction. *Black*, 222 Va. at 842; *Rams*, 70 Va. App. at 27 ("[T]he fact finder may conclude regarding even a non-testifying defendant that his false statements

- 23 -

establish that he has lied to conceal his guilt."). Since the totality of the evidence submitted at trial was overwhelmingly indicative of guilt, we can only conclude that any influence Officer Viola's testimony might have had upon the jury's determination was insignificant and slight, especially given that Ali was convicted of the lesser-included offense of abduction.

In addition, while we acknowledge that it was error for the trial court to admit the hearsay statements of Officer Viola, the jury also heard of M.C.'s prior allegations of sexual abuse during Barron's testimony and during the cross-examination of M.C. by Ali's own counsel. Barron testified that M.C. told her she had been sexually assaulted. Though Ali's counsel objected to this testimony, the trial court admitted it pursuant to Rule 2:803(2) as an excited utterance.[8] Moreover, during cross-examination of M.C., Ali's counsel asked, "Ma'am, when you initially gave a statement to the police, you claimed two sexual assaults, did you not?" Although the question did not elicit the specifics of her prior allegations, the fact remains that the hearsay statements admitted in error were to a significant degree cumulative of testimony elicited by Ali's own counsel. It was also cumulative of Barron's testimony. As we understand it, the dissent is implicitly concerned that the jury may have a) credited M.C.'s testimony at trial that her memory of the events of that night was poor; b) believed she had made allegations of sexual assault to the officer; and c) believed that the statements M.C. made to the officer were more accurate than her testimony at trial since they were made when the event was fresh in her memory. However, based upon the admissible testimony of Barron and M.C., as elicited by Ali's counsel, the jury could have engaged in the identical course of reasoning the dissent fears. Thus, because the hearsay statements admitted in error were cumulative in nature, they could have had but slight effect on the trial, and accordingly, Ali received a substantially fair trial.

---

[8] Ali assigns no error to this ruling on appeal.

Hence, we find the improperly admitted hearsay evidence could have had but slight effect upon the jury's verdict and therefore find the error in admitting the hearsay evidence harmless.

F. *The trial court did not err in providing the jury with a definition of "personal liberty."*

Ali finally argues that the trial court erred in responding to the jury's request for a definition of "personal liberty" and subsequently erred in denying his motion for a mistrial. We disagree.

In general, "the matter of granting and refusing jury instructions rests 'in the sound discretion of the trial court.'" *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). But we review de novo whether a proffered jury instruction "accurately states the relevant law." *Graves v. Commonwealth*, 65 Va. App. 702, 707 (2016) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)). "This Court's 'sole responsibility in reviewing' the trial court's decision 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (quoting *Cooper*, 277 Va. at 381). "Both the Commonwealth and the defendant are entitled to appropriate instructions to the jury of the law applicable to each version of the case, provided such instructions are based upon the evidence adduced." *Simms v. Commonwealth*, 2 Va. App. 614, 616 (1986).

Ali simply asserts that jurors needed no explanation of personal liberty and that a trial court should not emphasize a single part of the evidence. A great deal of his argument depends upon his contention that the trial court's instruction defining personal liberty was deficient and therefore the jury was misled by the trial court. However, Ali raised no objection to the accuracy or completeness of the instruction in the trial court, only arguing that the instruction was unnecessary. Hence, the accuracy of the definition is not before this Court for appellate review. *See* Rule 5A:18. Accordingly, we cannot conclude that no reasonable jurist would exercise his or her discretion to instruct the jury by providing the requested definition and can therefore find no error in doing so.

### III. CONCLUSION

For the foregoing reasons, the judgment of the trial court should be affirmed.

*Affirmed.*

Friedman, J., dissenting.

I join the majority with respect to its holdings on Ali's motion to suppress, the court's response to the jury's question about the meaning of "personal liberty," Ali's constitutional arguments relating to the interpreter, and the trial court's ruling as to the video recording of Ali's custodial interrogation; however, I dissent on the question of whether the significant evidentiary error below was harmless. I believe that Officer Viola's hearsay testimony that Ali twice touched or attempted to touch M.C. in a sexual manner without her consent was erroneously admitted by the trial court as a prior consistent statement. Because these statements were arguably the most damaging evidence presented against Ali, I would find that the erroneous admission of this evidence was not harmless error and I would remand the matter for a new trial on abduction under Code § 18.2-47 if the Commonwealth be so advised.

At trial, M.C. stated that Ali did not touch her during the I-95 stop. She also stated she had no recollection of Ali touching her in the church parking lot. Officer Viola was asked by the Commonwealth, "what did [M.C.] tell you generally about what happened that night?" Ali's counsel objected to the question on hearsay grounds. The Commonwealth argued the evidence was admissible as a prior consistent statement pursuant to Virginia Rule of Evidence 2:801(d)(2). *See infra* at 20-21. The trial court overruled Ali's objection, finding the evidence was admissible as a prior consistent statement.

In response to the Commonwealth's question, Officer Viola testified to the jury in relevant part as follows:

> She said that on the way home, the Lyft driver stopped, I believe it was twice she said, once on Interstate 95 near the Chippenham interchange area. She said at that point in time, the Lyft driver went into the back of the van that she was in, fondled her butt on the exterior of her clothing. She said that she went back to sleep at that point in time in the back of the van and the ride continued.

She said that she then remembers being at the—I think it's the
River Church in Enon in Chesterfield County. She said at that
point in time, he got into the back of the van. He stopped the van,
got into the back with her and then he took his hand—she wasn't
sure if her pants were up or down, but he took his hand, put it
towards her vaginal area, but it was unknown if it was inside her
pants, inside her underwear, she doesn't recall that, and she stated
she did not know if he penetrated her with anything.

Again, at trial, M.C did not testify that Ali touched her in a sexual manner on I-95—she stated

unequivocally that the driver was outside the van while she vomited from the side of the van.[9]

M.C. also did not testify at trial that Ali "took his hand [and] put it towards her vaginal area

. . . ."[10]

I would rule that Officer Viola's foregoing testimony constitutes inadmissible hearsay

and is not admissible as a prior consistent statement under Rule 2:801(d) because it was not

---

[9] M.C. stated: "The first time I woke up, I wanted to throw up, so I just remember asking him to pull over, and he did pull over, and then I threw up out the side of the van, same passenger side. I think it was 95 where the cameras are." M.C. further stated that, "I remember him being outside of the van. I don't . . . think I ever even looked at him while he was -- while this was happening." After the stop on I-95, M.C. went back to sleep. On cross-examination she confirmed she was not sexually assaulted when she threw up on I-95.

[10] M.C. testified:

All I saw was just -- all I saw was a figure close to me, but when I
woke up, I just reacted so quickly, I just didn't even -- something
in me just thought -- something in me, when I opened my eyes, this
is wrong and I just started hitting with my purse. I just remember
the fast moving and I saw the sign and just him being close to me, I
just started hitting.

M.C. further provided that her "pants were shifted . . . . They were just like when you wear your pants on your hips, they were just pulled down a little bit. Like my underwear and my pants were just rolled down a little bit." M.C. did not know how the pants got that way, and she did not remember whether Ali touched her. The Virginia Department of Forensic Science conducted DNA testing, comparing DNA on M.C. to Ali, and the parties stipulated to the fact that Ali was not a contributor.

consistent with M.C.'s trial testimony. In fact, M.C.'s trial testimony was *inconsistent* with Officer Viola's testimony about M.C.'s out-of-court statements.[11]

The next issue is whether the trial court's erroneous admission of Officer Viola's testimony constitutes harmless error. *See* Code § 8.01-678. Harmless error requires a showing that the parties had a fair trial on the merits and substantial justice was reached. *Id.* Error, however, is presumed to be prejudicial unless it plainly appears that it could not have affected the result. *Crumpton v. Commonwealth*, 9 Va. App. 131, 138 (1989). The burden is on the Commonwealth to establish that the trial court's error was harmless. *Angel v. Commonwealth*, 281 Va. 248, 265 (2011). "The Court may uphold a decision on the ground that any evidentiary error involved is harmless if it can conclude 'that the error did not influence the jury[] or had but slight effect.'" *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)).

In conducting a harmless error analysis, we do not ask whether the properly admitted evidence was sufficient to support the conviction, as that would conflate harmless error review with a sufficiency of the evidence challenge. *See Blackwell v. Commonwealth*, 73 Va. App. 30, 52 (2021); *see also Cartera v. Commonwealth*, 219 Va. 516, 519 (1978) (finding error not harmless and remanding for new trial, where "other evidence amply supports the jury's verdicts," but "the disputed testimony may well have affected the jury's decision"). "While a sufficiency analysis 'asks whether a rational [factfinder] *could have* found the defendant guilty[,]' harmless error review 'looks at the other side of the reasonable-doubt spectrum' and asks whether the evidence is such 'that a rational [factfinder] *would* have found the defendant

---

[11] Moreover, this evidence was admitted without limitation and used in support of Ali's charge of abduction with intent to defile. *See* Code § 18.2-48; *see also Crawford v. Commonwealth*, 281 Va. 84, 103 (2011) (finding abduction with intent to defile requires showing that the defendant committed an abduction with the intent to sexually molest the victim).

guilty absent the error[.]'"  *Blackwell*, 73 Va. App. at 52 (alterations in original) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).  To find an error is harmless, "the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict."  *Kilpatrick*, 301 Va. at 217.

The majority reasons that because Ali was acquitted of the charged offense—abduction with intent to defile—we need not worry about the wrongly admitted evidence because the jury ultimately did not accept Officer Viola's testimony.  The majority also argues there was overwhelming evidence of guilt such that substantial justice was done.  I disagree on both fronts.

First, the jury in this case struggled to reach a verdict.  After receiving their instructions and being sent to deliberate, the jurors returned and asked the trial judge for additional guidance on the terms "force," "intent to deprive of personal liberty," and "personal liberty."  After telling the trial judge they were deadlocked, they received an *Allen* charge.[12]  Ultimately, the jury rejected the Commonwealth's theory of abduction with intent to defile, but convicted Ali on the lesser-included offense of abduction.[13]

In my view, the evidence here did not overwhelmingly support a conviction.  The evidence was murky and disputed.  The driver took the passenger to the designated address—and she was free to leave, but could not be awakened.  The competing theories boiled down to whether Ali moved to the well-lit church parking lot to molest M.C. or, whether, after failing to get her to leave his vehicle, he decided to allow her to "sober up" in a parking lot rather than to

---

[12] *Allen v. United States*, 164 U.S. 492 (1896) (a jury instruction used to encourage a hung jury to reconsider).

[13] "Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of h[er] personal liberty . . . , shall be deemed guilty of abduction."  Code § 18.2-47(A).

sit conspicuously in an unfamiliar neighborhood with an incapacitated young woman in his backseat.[14]

The Commonwealth repeatedly argued to the jury that as soon as Ali drove away from M.C.'s delivery location, he had automatically abducted her because she wanted to be home. I agree with my colleagues that this logic is not entirely accurate—if this were true, a Lyft driver would be required to sit all night until an incapacitated passenger awoke without leaving their desired destination. Hypothetically, if Ali had taken M.C. to a hospital or police station for her own well-being (with no intent to deprive her of liberty), a jury could find that no violation of Code § 18.2-47(A) occurred. Had the driver desperately needed to use a bathroom at a convenience store or to get gas or a meal during a long shift, with no prurient or wrongful intent, he could have done so without abducting his passenger. Here, the question is, what *was* his intent in leaving the unfamiliar residential area to sit in a church parking lot while M.C. sobered up—and could the Officer Viola testimony have influenced the jury's analysis of that intent?[15]

In such a close case, I believe the wrongly-admitted testimony from Officer Viola plainly could have influenced the verdict. First, the accounts of Ali's alleged touching or fondling of

_____

[14] Lyft records indicate that Ali arrived at the destination provided by M.C. and her friend "Jersey" on S 21st Avenue in Hopewell at 3:22 a.m., based on timestamps and corresponding location data. The vehicle remained there until 3:26 a.m., at which point the driver left the unfamiliar area and relocated to the church parking lot. M.C. lived with her mother at the time of the incident, according to M.C.'s mother's testimony. Notably, shortly after M.C. arrived home, Officer Viola interviewed M.C. at an address on Danville Road in Hopewell which was not the address given to the Lyft driver.

[15] "[T]he *actus reus* of the crime is a taking, transporting, or detention of another, while the *mens rea* of the crime is a specific intent to deprive another of her liberty." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022). "Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender." *Secret v. Commonwealth*, 296 Va. 204, 228-29 (2018) (quoting *Commonwealth v. Herring*, 288 Va. 59, 75 (2014)). Indeed, intent "most often is[] proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Id.* at 229 (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005)).

M.C. on I-95 cast suspicion on his general intent and character. The Commonwealth posited no motive for the alleged abduction other than a prurient interest in M.C.[16] Moreover, a suspicion of prurient interest could be relevant to abduction even if the jury found the evidence fell short of proving an intent to defile. Second, the jury could have concluded that an intent to touch did not encompass an intent to defile—but could still constitute an intent to deprive M.C. of her personal liberty to be free of unwanted contact. If the jurors believed Officer Viola's statement that Ali touched M.C. on I-95, they might easily conclude that it was likely he went to the church parking lot with similar notions. Thus, the error here could have had a significant impact on the ultimate verdict.

To be clear, I agree with the majority that there is sufficient evidence to convict Ali of abduction on this record. The principal evidence supporting this outcome are his misstatements to police about the events of the night and the inferences arising from those statements. However, again, conducting a sufficiency of the evidence review is a distinct task from assessing whether an error is harmless. *See Blackwell*, 73 Va. App. at 52. While there is sufficient evidence to establish abduction, this was a close case marred by the wrongful admission of extremely prejudicial testimony. Given the erroneous admission of Officer Viola's statements, there is a distinct possibility that the jury convicted Ali based on inadmissible evidence. On this

---

[16] Indeed, in closing argument the prosecution urged the jury to analyze Ali's intent by weighing his actions during the ride:

> He doesn't have to finish the job for him to have committed the crime that he's currently charged with; he just has to have that intent when he takes her away. That intent is shown by the things he did and the way he did them.

> You're never going to be able to look into another person's mind and be sure exactly what they thought, the words that were going through there. The law allows you to determine intent based on actions.

record, I cannot say that the evidence of guilt is "so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict." *See Kilpatrick*, 301 Va. at 217.

For the foregoing reasons, I respectfully dissent and would remand the matter for a new trial on the lesser-included offense of abduction if the Commonwealth be so advised.