Present:   All the Justices

HARLESS FITZGERALD ROSE

                OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.

v.  Record No. 041737             June 9, 2005

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

I.

In this appeal of a criminal conviction, we consider whether the Commonwealth was entitled to present evidence of a defendant's prior criminal acts to establish that he was the perpetrator of the charged crimes.

II.

A grand jury in the Circuit Court of the County of Wise and the City of Norton indicted Harless Fitzgerald Rose for the capital murder of Timothy Dale Hughes in the commission of robbery or attempted robbery in violation of Code § 18.2-31, robbery in violation of Code § 18.2-58, and use of a firearm during the commission of a robbery or attempted robbery in violation of Code § 18.2-53.1.  During a jury trial, the Commonwealth was permitted, over Rose's objection, to present evidence that he had committed a robbery several months before the capital murder that is the subject of this appeal.

The jury found Rose guilty of the charged offenses.  The jury fixed his punishment at life imprisonment for the capital murder offense, 35 years imprisonment for the robbery offense,

and three years imprisonment for the use of a firearm while committing the robbery.

The circuit court entered a judgment confirming the jury's verdict, and Rose appealed the judgment to the Court of Appeals. Rose argued in the Court of Appeals, among other things, that the circuit court abused its discretion by permitting the Commonwealth to introduce evidence of his prior criminal conduct during the guilt phase of the trial. The Court of Appeals, in an unpublished opinion, held that the circuit court did not err because this evidence "was sufficiently idiosyncratic and similar to the charged robbery to establish the probability of a common perpetrator and the record supports a finding that the probative value of the evidence of the [prior] robbery outweighed its potential prejudicial effect." Rose v. Commonwealth, Record No. 0995-03-3 (July 6, 2004) (unpublished). Rose appeals.

                              III.

Applying well-established principles of appellate review, we must consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below. Correll v. Commonwealth, 269 Va. 3, 6, 607 S.E.2d 119, 120 (2005); Zimmerman v. Commonwealth, 266 Va. 384, 386, 585 S.E.2d 538,

539 (2003); Phan v. Commonwealth, 258 Va. 506, 508, 521 S.E.2d 282, 282 (1999).

The prior robbery, which is pertinent to this appeal, occurred on July 18, 2000, about 10:30 p.m., when Linda Couch returned to her home in Coeburn, located in Wise County. Couch was the driver of her car, and Couch's mother was a passenger in the car. Couch parked the car in front of her home and exited from the driver's door. She placed her pocketbook on her shoulder, and she began to walk around the car to help her mother. Suddenly, someone hit her in the back and "knocked" her against the car. Couch stated, "It felt like . . . it was really hard; I don't know if it was a fist or not. And they hit me once, and I kept hanging on to my pocketbook, and they hit me again, and had me down on the ground dragging me, and I let my pocketbook go. And my keys flew over in the yard, so they took, took my pocketbook; everything but my keys."

Peggy Wireman, Couch's next-door neighbor, heard Couch's screams for help. Wireman left her home, went outside, and chased the assailant. The assailant, who wore a stocking mask, dark jogging pants and a hooded jacket, eluded Wireman by running up a hill through some dense "really harsh" vegetation that included briars.

Rose was the perpetrator of this crime.  His girlfriend at the time, Jessica Amanda Counts Salyers, and two other friends, had helped him plan the robbery.  They also helped him leave the scene of the robbery.

The crimes in the present case occurred on October 5, 2000, around 10:30 p.m., after Timothy Hughes, James Brown, and Lucas Hurley, employees of the PayLess Supermarket in Coeburn, closed the store and walked together to a nearby bank where they intended to deposit the store's money.  Unbeknownst to the men, Rose had made plans to rob them, and he had been at the store earlier that same evening.

As Hughes, Brown, and Hurley approached the bank's night deposit box, a man "came around the corner," holding a pistol in his right hand.  The man wore a ski mask, a dark sweatshirt and sweatpants.  The man told Hughes, Brown, and Hurley to "stop and give me the money."  Hurley tossed the money to the robber.  Hughes "shuffled or moved," and the robber shot Hughes.  Hughes fell to the ground, but stood up and began to chase the robber, who was running away.  Hurley and Brown "froze."

A few seconds later, Brown and Hurley heard a pistol discharge.  They ran towards Hughes, who had been shot a second time.  Hurley tried to help Hughes walk back to the bank.  Hughes was unable to do so.  Hurley and Brown contacted

4

the Sheriff's Department, and Hughes later died of gunshot wounds to his chest and abdomen.

Several persons were in the vicinity of the PayLess Supermarket and observed someone run through yards and "up the gravel road." Deputy Sheriff Ernie Caldwell, an employee of the Wise County Sheriff's Department, used a bloodhound to track the scent of the robber that night. The trail that the bloodhound was able to detect indicated that the robber ran through an area that "was overgrown with brush and vines and thorns."

When Jessica Salyers was romantically involved with Rose, they were addicted to Oxycontin. They sold illegal drugs and engaged in other criminal acts to support their addiction.

The day after the robbery, Rose went to Salyers' home that she shared with her mother. When Salyers got into a car that Rose was driving, she noticed that he had "scratches on his face . . . really bad scratches." Rose also had scratches on his arm. Salyers stated, "[the scratches] were, they had been made recent. They were fresh. They were really, really bad. Not like a cat scratch; it was all over. It was on his nose, his cheeks, on his chin, his neck. And they wasn't as bad on his arms, but they were pretty bad." However, a deputy sheriff who saw Rose on the night of the murder testified that he did not see any scratches on Rose's face.

5

Rose gave Salyers between 30 to 60 Dilaudid pills, a controlled medication.  Rose and Salyers spent the night in a hotel room, and they ingested "a bunch" of pills.  Rose "had a roll, a wad of money."  Rose had also purchased new clothes and shoes.  When Salyers asked Rose where he obtained the money, he lied by responding that he was working in the coal mines and that he "was making pretty good money."  Rose was actually unemployed.

Some time before Rose robbed the employees of PayLess Supermarket and killed Hughes, Rose made statements to Salyers about committing "a robbery of the supermarket."  Salyers stated that Rose "commented that [there were] no cops that escorted the person with the money bag."

One night after the murder, Kelly N. Sexton was at a party.  Rose, Jessica Salyers, and others were present, and they were ingesting Oxycontin.  Sexton overheard Rose say "something about killing something, or he has killed something."

Patrick R. Sexton had a conversation with Rose before Hughes was robbed and murdered.  Rose asked Sexton if Sexton had a "handgun" or shotgun because Rose "was having some trouble with some boys . . . in Coeburn."  Kenneth Miller, an acquaintance of Rose, saw Rose within a week after the murder.  Rose had scratches on his face, and Miller asked Rose, "[D]id

6

your girlfriend scratch you up or something hit you?"  Rose replied, "no," and that "he got [them] running through a briar patch. . . . he was running through the briar patch, running from the law."

Rose discussed the murder and robbery of Timothy Hughes with numerous persons who were inmates with him when he was in jail awaiting trial.  Rose told Otis B. Luther that Rose shot Hughes the second time because Hughes "hollered" Rose's name.  Rose told Joshua E. T. Spears that Rose shot Hughes because Hughes was able to identify Rose.

Spears also testified that Rose stated that after he shot and robbed Hughes, Rose ran by the house where the assailant's mask was eventually found.  Captain Michael Holbrook, the chief investigator for the Wise County Sheriff's Department, recovered a dark-colored ski mask from the residence of Kenneth Richardson.  Spears testified that when he was incarcerated with Rose, Rose said he "ran up by a coach's house."  According to Richardson, some of the students in Wise County called him "Coach."  Ricky A. Church, another person who was incarcerated in jail with Rose, stated that when Rose learned that the mask had been found, Rose stated:  "Well, if they got the mask, then they got me."

Rose told George D. Hobbs, another inmate in the Wise County Jail, that "none of this shit would have happened here

7

today if the guy had just gave him the money." Rose also told Hobbs that "[i]f they've got the ski mask, they've got my ass." Rose admitted to Charles Hodge, who was an inmate with Rose when he was incarcerated in the Lee County Jail, that Rose "killed someone making a night deposit, then threw the weapon in the river."

James Stidham met with Rose sometime after the murder. Rose identified himself as "Robbie." Rose told Stidham that Rose "wouldn't a killed him if he wouldn't have identified him or chased him." Rose showed Stidham a "medium-sized revolver."

Chris Fisher, the store manager of the PayLess Supermarket, testified that the amount of the deposit that the robber stole totaled $13,485.18: "[S]ilver and currency was $4,478.00, food stamps was $548.00, office checks was $1,414.74, [and] registered checks was $7,044.44."

Patricia Taylor, a forensic scientist with the Virginia Division of Forensic Science, testified that she performed DNA analysis on the mask that was recovered. A DNA profile obtained from a sample from the inside of the ski mask was consistent with a mixture. This means that DNA was present from more than one individual. Taylor opined that "Harless Rose and another individual cannot be eliminated as possible co-contributors to the genetic material that I detected from

8

the ski mask.  The DNA profile, at five specific regions of the DNA obtained from the sample from the inside of the ski mask, is eight thousand, three hundred times more likely to have originated from Harless Rose and one unknown individual, than from two unknown individuals in the Caucasian population."

IV.

A.

Rose argues that the Court of Appeals erred by concluding that the Commonwealth was permitted to introduce evidence of his prior crimes because the robbery of Linda Crouch did not bear a singular strong resemblance to the robbery of Hughes and, thus, the robberies were not sufficiently idiosyncratic. The Commonwealth responds that the robberies were similar and that evidence of the prior robbery was properly used to identify Rose as the perpetrator of the charged crimes.  We disagree with the Commonwealth.

The principles that govern our resolution of this appeal are well-established.  In our jurisprudence, evidence of other crimes is generally not admissible to prove that a defendant is guilty of the crime charged.  Commonwealth v. Minor, 267 Va. 166, 171, 591 S.E.2d 61, 65 (2004); Scates v. Commonwealth, 262 Va. 757, 761, 553 S.E.2d 756, 758 (2001); Guill v. Commonwealth, 255 Va. 134, 138, 495 S.E.2d 489, 491

(1998).  Explaining this rule, we stated that "[s]uch evidence implicating an accused in other crimes unrelated to the charged offense . . . may confuse the issues being tried and cause undue prejudice to the defendant."  Id.

We have, however, recognized exceptions to this general rule:

> "Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward [the] victim . . . or if it tends to prove any relevant element of the offense charged.  Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial.  Also, testimony of other crimes is admissible [when] the other crimes constitute a part of the general scheme of which the crime charged is a part."

Minor, 267 Va. at 172, 591 S.E.2d at 65.  See also Satcher v. Commonwealth, 244 Va. 220, 230, 421 S.E.2d 821, 828 (1992); Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970); accord Scates, 262 Va. at 761, 553 S.E.2d at 759.

Additionally, evidence of other crimes is also admissible if such evidence is relevant to show the perpetrator's identity when some aspects of the prior crime are so distinctive or idiosyncratic that the fact finder reasonably could infer that the same person committed both crimes. Minor, 267 Va. at 174, 591 S.E.2d at 66; Guill, 255 Va. at 141, 495 S.E.2d at 493; Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 616 (1990); Turner v. Commonwealth, 259

10

Va. 645, 651, 529 S.E.2d 787, 790-91 (2000); Chichester v. Commonwealth, 248 Va. 311, 326-27, 448 S.E.2d 638, 649 (1994); see Powell v. Commonwealth, 267 Va. 107, 141, 590 S.E.2d 537, 558 (2004).

Admission of evidence of other crimes committed by a defendant, under these exceptions, is subject to the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice to the defendant. Minor, 267 Va. at 172, 591 S.E.2d at 65; Guill, 255 Va. at 139, 495 S.E.2d at 491-92; Lewis v. Commonwealth, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).

Applying the aforementioned principles, we hold that the circuit court erred by permitting the Commonwealth to present evidence that Rose had committed the robbery of Couch. When Rose robbed Couch, he hit her with his fist; he dragged her on the ground and took her purse; and he fled by running through some bushes and eventually through vegetation that contained briars. Rose wore a black or dark blue jogging outfit, and a hood or stocking covered his head when he committed these criminal acts.

When Rose robbed the PayLess Supermarket employees and murdered Hughes, Rose also wore dark clothing, described as a sweatsuit. However, Rose wore a mask, and he was armed with a pistol with a short barrel. Unlike the purse-snatching and

11

assault of Couch, Rose committed an armed robbery and murder of Hughes. Even though Rose fled the scene of the robbery and murder by running through a parking lot, yards, and a hill where there were trees and briars, the facts surrounding the two crimes are not sufficiently distinctive or idiosyncratic to permit the jury to draw an inference that Rose was the perpetrator of both crimes. Accordingly, we hold that the circuit court and the Court of Appeals erred by concluding that the evidence of Rose's prior criminal acts was admissible.

### B.

The Commonwealth argues that even if the circuit court erred in admitting the evidence of prior crimes, such error was harmless because of the "wealth of evidence [that] connected Rose to the robbery and murder of Tim Hughes." Responding, Rose argues that the error was not harmless and that such error affected the jury's factual findings. We disagree with Rose.

When deciding whether non-constitutional error is harmless in the context of a criminal proceeding, we must apply Code § 8.01-678 that states in pertinent part:

> "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect,

imperfection, or omission in the record, or for any error committed on the trial."

We stated in Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001) that "[i]n a criminal case, it is implicit that, in order to determine whether there has been 'a fair trial on the merits' and whether 'substantial justice has been reached,' a reviewing court must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless."

In Clay, we adopted the following test for non-constitutional harmless error that was applied by the United States Supreme Court in Kotteakos v. United States, 328 U.S. 750 (1946):

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 764-65.

Applying the harmless error test and Code § 8.01-678, we conclude that the circuit court's decision to admit evidence of the prior crime was indeed harmless error. The evidence of

Rose's guilt is overwhelming.  Rose told his former girlfriend several months before the murder and robbery that he was considering robbing PayLess Supermarket employees.  He stated to Salyers that there were "no cops that escorted the person with the money bag."  Rose was seen outside the PayLess Supermarket the day of the robbery and murder.

After the robbery, two persons observed scratches on Rose's face, arms, nose, cheeks, chin, and neck.  Rose told Kenneth Miller that Rose received the scratches when "he was running through the briar patch, running from the law."  Rose admitted his involvement in the robbery and murder to numerous persons including Ricky Church, George Hobbs, Charles Hodge, Otis Luther, Kenneth Miller, Josh Spears, and James Stidham.  Additionally, Rose, who used a pistol during the commission of the robbery and murder, showed a small or medium-sized pistol to James Stidham.

Additionally, Rose told Josh Spears he ran by "a coach's house" after the murder, and students in Wise County called Kenneth Richardson "Coach."  Captain Michael Holbrook recovered a dark-colored ski mask from Richardson's home.  As we have already stated, Patricia Taylor, a forensic scientist, testified that "[t]he DNA profile [of DNA samples inside the mask], is eight thousand, three hundred times more likely if it originated from Harless Rose and one unknown individual,

14

than if it originated from two unknown individuals in the Caucasian population."  Several weeks after the robbery and murder, a police officer observed Rose crying at the scene of the robbery and murder.

Applying Code § 8.01-678 and the test we adopted in Clay, and upon our consideration of the record, we conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," that it plainly appears that Rose had a fair trial and that the verdict and judgment were not substantially affected by the admission of evidence of the purse-snatching crime.

V.

Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.

15