COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia

YAHSIM TREMAINE WILLIAMS

OPINION BY
v.      Record No. 0545-24-2          JUDGE STUART A. RAPHAEL
SEPTEMBER 16, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHARLES CITY COUNTY
B. Elliott Bondurant, Judge

Charles E. Haden for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

This case involves three armed robberies by a masked gunman at Dollar General stores

within a ten-day span in the summer of 2022. Yahsim Tremaine Williams was charged with and

convicted of crimes committed during the third robbery, where the gunman shot and wounded a

police officer. The gunman's identity was the most significant issue in dispute. The

Commonwealth offered evidence from the first two robberies to show that Williams was the

gunman and that he followed the same pattern each time. The evidence included cellphone

location data, text messages, and photographs from Williams's cellphone.

Williams challenges the admission of that evidence, arguing that its probative value was

outweighed by its prejudicial effect. He also argues that the Commonwealth failed to prove his

guilt beyond a reasonable doubt. Finding no error, we affirm. In doing so, we clarify that the

balancing tests are different under Virginia Rules of Evidence 2:403 and 2:404 for determining

when otherwise admissible evidence must be excluded because of its prejudicial effect.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the prevailing party below. *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). "Doing so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

*The robberies at the Dollar General stores in New Kent and Williamsburg*

At 6:46 p.m. on July 22, 2022, surveillance cameras outside George Watkins Elementary School in New Kent County captured "a dark colored vehicle . . . traveling westbound" toward a Dollar General store less than a mile away. Around 7:15 p.m., a man with a "tall, slender build" walked into that store wearing a hooded sweatshirt "pulled tight with a gun in his hand." A customer witnessed the man say to the store employee, "you know, this isn't a joke, give me the money, hurry up." The customer identified the man as a Black male. Shortly after the robbery, the Watkins Elementary security cameras recorded a dark colored vehicle "head[ing] eastbound" that looked "very similar" to the vehicle seen earlier. That car was later determined to be registered to Williams.

A week later, on July 29 at about 1:58 p.m., "a slender young man . . . dressed completely in dark clothes, mask, hands covered," walked into a Dollar General store in Williamsburg with a gun. Two store managers, Kenisha Freeman and Edith Kelly, were on duty when the gunman came behind the counter. Both described the gunman as a Black male. The gunman ordered everyone present to come to the front of the store and to put their hands on the counter. He ordered Freeman and Kelly to "empty the registers and set the safe." The gunman said he knew there was "a nine-minute wait" to open the safe because "he used to work for Dollar General."

While waiting for the safe to open, he ordered Freeman and Kelly to take the money from the store registers and stuff it into yellow Dollar General bags.[1]  The gunman said as he left the store, "nobody move for five minutes."  Security-camera footage of the Williamsburg robbery was entered into evidence.

*The robbery at the Dollar General store in Charles City*

On the evening of August 1, 2022, Nelson Peck and Emerald Johnson were working at a Dollar General store in Charles City County.  Johnson was in the office monitoring the store cameras when she noticed a man enter the store with a gun.  Images from the store's security camera showed the gunman dressed in a black t-shirt over a maroon hooded sweatshirt.  His gloves were red, gray, and black in color.  While stocking store shelves, Peck looked up to see the robber pointing a gun at him.  Watching the events unfold on the security cameras, Johnson called 911 to report the armed robbery in progress.

Peck went to find Johnson, but she was still in the office with the door closed.  The gunman "put the gun to [Peck's] forehead" and demanded money from the cash registers.  Peck testified that the gunman was a Black male.  Peck opened the registers and, as the robber directed, put the money into yellow Dollar General bags.  As the robber was leaving with the cash, Peck "heard three shots fired inside the store."  He then heard eight more shots outside.

Violet Harris was shopping at the Dollar General store with a friend.  The robber ordered her to stand with her "hands up on the drink machine" while her friend stood "at the other end with his hands on the counter."  Harris described the robber as a Black male, over six-feet tall, and "slender."  After Harris heard the gunshots, a sheriff's deputy came into the store and said, "I have been hit."

---

[1] When the safe opened, it was empty.

That was Sheriff's Deputy Alisha Buchanan. Buchanan testified that when she walked through the front door of the store, the robber was pointing a gun at her. He yelled, "hands down, hands down" before firing multiple shots. One image from the store's security camera shows the robber pointing his gun directly at Buchanan as she twists away to avoid being shot. One of the bullets struck her in the back, piercing her bullet-proof vest. Buchanan survived the shooting. Although the bullet did not pierce her body, she testified that it has left permanent scarring and caused her to experience painful back spasms for which she needs continuing treatment. Buchanan's body-camera footage was played for the jury.

Law-enforcement officers at the crime scene recovered multiple cartridge casings from two guns—.40 caliber cartridge casings that matched the firearm carried by Deputy Buchanan, and .45 caliber cartridge casings found both outside the store and just inside the door. The officers used red and blue cones to mark the locations of the cartridge casings, mapping the shootout that unfolded as the gunman fled. The map was entered into evidence at trial.

*Police find Williams's cellphone*

On October 24, 2022, Officer Rene Barierre with the Newport News Police Department attempted to stop a black Hyundai Sonata driven by Williams.[2] Barierre commanded Williams to turn off the engine and exit the car, but he drove away. A high-speed chase ensued. It ended when Williams tried "to turn left onto a road and hit a dumpster." Williams fled on foot, but he left behind various personal items, including his wallet and cellphone. Detective Alyson Bradbury obtained a search warrant for the phone and retrieved it from the vehicle. Everything else remained in the car, which was later impounded at a lot in Newport News.

---

[2] Barierre identified Williams at trial but stated that she did not know him during the attempted traffic stop.

Detective Carl Neidengard investigated the ownership and contents of the phone. In response to a search warrant, T-Mobile identified Williams as the phone's "subscriber" and account holder. A USB drive with the phone's raw data was entered into evidence.

The phone's search history revealed a series of news articles about the robbery at the Dollar General store in Charles City. The store address had also been searched a few times, including at 5:02 p.m. on August 1, shortly before the robbery. The phone's user also ran the following internet search queries:

- "Does being caught stealing on camera in a mask prove it beyond a reasonable doubt."

- "If caught on camera, can you still be arrested if you can't be identified; example, wearing a mask while breaking and entering. If yes, on what grounds?"

Various text messages from the phone were also admitted into evidence to show that it was Williams's phone. One outgoing text specified Williams's full name, his date of birth, his social security number, and his "best contact number"—which was the same number assigned to the phone.

On July 30—two days before the Charles City robbery—a text and photograph "depicting two handguns" were sent from Williams's phone to "Malcolm" and "Bop." The message to Malcolm read, "45. Back."[3] On the day of the robbery, shortly after it happened, an outgoing text to "Redblock" said, "I ain't gonna run or none. Definitely was sighted big bro so just [let me know] if you hear anything about that shit tho." A few hours later, a text message to "Veedoo" said, "tell him to give me at least till 12:45 shit went down today shells flying type shit."

---

[3] The text messages admitted at trial consistently had the letter "x" in places that should have had the letter "c." For example, the text to Williams's mother, said "rexently" instead of "recently." The Commonwealth's attorney noted for the record that "all of the 'X's' in the phone should be portrayed as 'C.'"

Two days after the Charles City robbery, the phone's user texted "Mommy" saying, "Mommy I love you and just want you to know that I got into sum serious shit recently don't worry bout me imma be okay." The phone number for "Mommy" belonged to Williams's mother.

*The cell-site location data*

Special Agent Jeremy D'Errico, who qualified as an expert in cell-site and location-data analysis, testified about the cellphone's call-detail records and the cell-site location data subpoenaed from T-Mobile. D'Errico explained that the call-detail records showed which cell tower was activated by the cellphone. The records depicted the "general area" of the phone's location at a given time. D'Errico reviewed the phone's call-detail records for the dates of each robbery: July 22 (New Kent County), July 29 (Williamsburg), and August 1 (Charles City County).

D'Errico testified that on July 22, Williams's phone left Hampton in the direction of New Kent between 5:03 p.m. and 5:38 p.m. After a brief stop near Williamsburg, the phone was in New Kent at 6:38 p.m. Mobile-app data revealed a transaction at "Rick's Stop and Shop" at 6:56 p.m. Rick's Stop and Shop is about "a quarter mile" from the New Kent Dollar General store. The robbery occurred around 7:15 p.m. Then between 7:16 p.m. and 8:29 p.m., the phone traveled back to Hampton. By 9:01 p.m., the cellphone was using a cell tower "consistent with providing service" to a residence associated with Williams.

On July 29, the phone departed Hampton around 8:16 a.m. in the direction of Newport News. It stopped briefly in Yorktown, but then it spent over four hours (from 9:11 a.m. to 1:58 p.m.) using a cell tower "consistent with providing coverage to the area of Dollar General in Williamsburg, James City County." Williams's phone returned to Hampton between 1:58 p.m. and 2:43 p.m.

Finally, on August 1, the phone moved toward Smithfield around 4:20 p.m., stopping briefly in Surry until 5:21 p.m. While in Surry, the phone's user searched Google for the address of the Dollar General store in Charles City. By 6:00 p.m., Williams's phone was using a cell tower behind Charles City High School. From 6:23 p.m. to 6:49 p.m., the phone stayed close to the high school, "pointing in the direction of Dollar General." The phone remained in "the area of Dollar General" for 30 minutes. Then it traveled back to Hampton.

*Other evidence recovered from the Hyundai Sonata*

Executing a search warrant on the impounded black Hyundai Sonata, Detective Nicholas Russillo testified that he recovered a "Virginia Villains" hat and a blue duffle bag. Russillo found Williams's social security card, three identification cards bearing Williams's name, a Hampton High School I.D. bearing Williams's name, an insurance card and a medical card bearing Williams's name, and a few bank cards also belonging to Williams. Photos recovered from Williams's cellphone showed him wearing the Virginia Villains hat.

The search of Williams's residence

First Sergeant Kecia Purdue of the Virginia State Police executed a search warrant at a residence associated with Williams on Quash Street in Hampton. Photographs of the collected items were entered into evidence. In one of the bedrooms, Purdue found various pieces of mail addressed to Williams. The envelopes addressed to Williams showed three different addresses.[4] Purdue also found a sweatshirt bearing a screen-printed photograph of Williams with a child that Purdue assumed was his son. Purdue seized the sweatshirt because it looked like the one the gunman had worn under a black t-shirt during the Charles City robbery.

---

[4] Purdue admitted on cross-examination that a search warrant was issued only for the Quash Street address.

In addition, Purdue recovered "red, gray, black Hyper Tough" gloves from a garbage bag in the closet. The design resembled the gloves worn by the gunman in the Charles City robbery. Also in the closet was a ski mask and another screen-printed shirt of Williams with his son. Purdue swore out a warrant for a sample of Williams's DNA to compare it with the DNA on the gloves.

Forensic scientist Memory Dalton testified that Williams could not be eliminated as a major contributor of the DNA found in the left-hand glove recovered by Purdue. The probability that someone other than Williams left that DNA was about 1 in 7.2 billion.[5]

Eighteen witnesses testified at Williams's jury trial to the facts set forth above. The trial court denied Williams's motion to strike at the close of the Commonwealth's evidence and his renewed motion to strike at the close of all evidence. Included in the jury instructions was the following limiting instruction about the evidence from the New Kent and Williamsburg robberies:

> You may consider evidence that the defendant committed a crime other than the crime for which he is on trial only as evidence of the defendant's identity, as evidence of the defendant's premeditation, or as evidence of the unique nature of the method of committing the crime charged in connection with the crime for which he is on trial and for no other purpose.

The jury found Williams guilty of the crimes charged in the indictment: attempted aggravated murder, aggravated malicious wounding, robbery resulting in serious bodily injury, use of a firearm in the commission of attempted aggravated murder, and use of a firearm in the commission of aggravated malicious wounding. The trial court imposed three life sentences plus an additional eight years (the mandatory minimum for the two firearms charges). Williams appeals.

---

[5] The DNA found in the right-hand glove was "too complex" to interpret.

ANALYSIS

Williams claims that the trial court erred by admitting evidence about the New Kent and Williamsburg robberies and by admitting evidence from his cellphone. He does not dispute that that evidence was probative in showing that he was the person who robbed the Charles City store. He argues only that the trial court should have excluded the evidence because its prejudicial effect outweighed its probative value.

We will not disturb a trial court's decision to admit or exclude evidence unless the trial court abused its discretion. *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021). "A trial court abuses its discretion by (1) failing to consider a significant relevant factor, (2) giving significant weight to an irrelevant or improper factor, (3) committing a clear error of judgment in assigning weight to all proper factors, or (4) making a mistake of law." *Citizens for Fauquier Cnty. v. Town of Warrenton*, 81 Va. App. 363, 385 (2024) (quoting *Cornelius v. Commonwealth*, 80 Va. App. 29, 41 n.13 (2024)). We do not substitute our own judgment for the trial court's but "consider only whether the record fairly supports the trial court's action." *Kenner*, 299 Va. at 423 (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)).

A. *The balancing test in Rule 2:404 differs from the test in Rule 2:403.*

The evidentiary issues here involve Virginia Rules of Evidence 2:403 and 2:404, which impose different standards for determining when to exclude probative evidence based on its prejudicial effect. Rule 2:403 is the general standard governing the admissibility of relevant evidence. Relevant evidence is admissible unless "the probative value of the evidence is *substantially outweighed* by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. R. Evid. 2:403(a) (emphasis added). Rule 2:404 governs the

- 9 -

admissibility of prior-bad-act evidence.[6]  It provides (subject to exceptions not applicable here)

that "evidence of other crimes, wrongs, or acts is generally not admissible to prove the character

trait of a person in order to show that the person acted in conformity therewith."  Va. R. Evid.

2:404(b).  Such evidence is admissible, however, "if it tends to prove any relevant fact pertaining

to the offense charged, such as where it is relevant to show motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a

---

[6] Rule 2:404—entitled "Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes"—reads in full:

> a) *Character evidence generally.* — Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> > (1) *Character trait of accused.* Evidence of a pertinent character trait of the accused offered by the accused, or by the prosecution to rebut the same;
> >
> > (2) *Character trait of victim.* Except as provided in Rule 2:412, evidence of a pertinent character trait or acts of violence by the victim of the crime offered by an accused who has adduced evidence of self defense, or by the prosecution (i) to rebut defense evidence, or (ii) in a criminal case when relevant as circumstantial evidence to establish the death of the victim when other evidence is unavailable; or
> >
> > (3) *Character trait of witness.* Evidence of the character trait of a witness, as provided in Rules 2:607, 2:608, and 2:609.
>
> (b) *Other crimes, wrongs, or acts.* — Except as provided in Rule 2:413 or by statute, evidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith.  However, if the legitimate probative value of such proof outweighs its incidental prejudice, such evidence is admissible if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.

- 10 -

common scheme or plan." *Id.* Although Rule 2:404(b) also requires the trial court to balance the probative value of the evidence against its potential prejudice, it does not use the "substantially outweighs" standard from Rule 2:403(a). Instead, Rule 2:404(b) permits the introduction of otherwise admissible prior-bad-act evidence only "if the legitimate probative value of such proof outweighs its incidental prejudice."

The difference in balancing tests makes it easier for a party to introduce relevant evidence generally than to introduce relevant prior-bad-act evidence. Prior-bad-act evidence that is otherwise admissible must be excluded whenever its probative value is merely outweighed by its incidental prejudice; the prejudice need not *substantially* outweigh the probative value.[7]

That difference reflects long-standing Virginia precedent that predates the Virginia Rules of Evidence themselves. For more than 40 years, our Supreme Court has held that the "incidental prejudice" standard applies when weighing the probative value of prior-bad-act evidence against its prejudice. *See Lewis v. Commonwealth*, 225 Va. 497, 502 (1983) ("Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if otherwise competent, is admissible."). Although the "incidental prejudice" standard first appeared in *Lewis*, our Supreme Court has repeated it many times since, including most recently in *Commonwealth v. Carolino*, 303 Va. 399, 412 (2024) ("Before the evidence of a prior bad act is admitted, the trial court must be able to conclude that the legitimate probative value of the evidence is not outweighed by any incidental prejudice." (citing Va. R.

---

[7] Although Rule 2:404(b) changes the prejudice test for prior-bad-act evidence, it does not undermine the trial court's authority to exclude such evidence based on the "likelihood of confusing or misleading the trier of fact" or because "the evidence is needlessly cumulative." Va. R. Evid. 2:403(a)(ii), (b).

Evid. 2:404(b))).[8]  Rule 2:404(b) codified that long-standing test when the General Assembly

and Supreme Court promulgated the Virginia Rules of Evidence in 2012.[9]

The balancing test in Rule 2:404(b) differs from the balancing test applied by federal

courts under Federal Rule of Evidence 404, which is silent about which test applies.[10]  In 1985,

Professor Imwinkelried warned that because Federal Rule 404(b) had no balancing test, courts

would likely borrow the "substantially outweighs" standard from Federal Rule 403, a move that

he said would "turn[] the common-law rules upside down."  Edward J. Imwinkelried, *The Need*

*to Amend Federal Rule of Evidence 404(b): The Threat to the Future of the Federal Rules of*

---

[8] *See, e.g.*, *Kenner*, 299 Va. at 427 ("In addition to being relevant and material, other crimes evidence 'is subject to the further requirement that the legitimate probative value of the evidence must exceed its incidental prejudice to the defendant.'" (quoting *Rose v. Commonwealth*, 270 Va. 3, 11 (2005))); *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008) (same); *Pryor v. Commonwealth*, 276 Va. 312, 317 (2008) (same); *Scates v. Commonwealth*, 262 Va. 757, 761 (2001) (same); *Guill v. Commonwealth*, 255 Va. 134, 139 (1998) (same); *Goins v. Commonwealth*, 251 Va. 442, 462 (1996) (same); *Spencer v. Commonwealth*, 240 Va. 78, 90 (1990) (same); *Woodfin v. Commonwealth*, 236 Va. 89, 95 (1988) (same); *Hawks v. Commonwealth*, 228 Va. 244, 247 (1984) (same).  Sometimes the Court has omitted the word *incidental* and said simply that the prejudice must not outweigh the probative value.  *E.g.*, *McGowan v. Commonwealth*, 274 Va. 689, 694-95 (2007).

[9] *See* Order (Va. July 1, 2012) (promulgating Virginia Rules of Evidence), https://perma.cc/8AGV-QWTR; 2012 Va. Acts ch. 688, at 1409 (providing that the Rules of Evidence promulgated by the Supreme Court of Virginia "shall become effective on July 1, 2012").  The Virginia Rules of Evidence simply "state the law of evidence in Virginia.  They . . . implement established principles under the common law and [do] not . . . change any established case law rendered prior to the adoption of the Rules."  Va. R. Evid. 2:102.

[10] Federal Rule of Evidence 404(b) provides:

(b) *Other Crimes, Wrongs, or Acts*.

(1) *Prohibited Uses*.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

*Evidence*, 30 Vill. L. Rev. 1465, 1470 (1985). He urged that Federal Rule 404 be amended to clarify that it requires only a simple balancing of probative value against unfair prejudice. *Id.* at 1497. But the United States Supreme Court did not heed that call. In *Huddleston v. United States*, 485 U.S. 681 (1988), the Court held that evidence that is otherwise admissible under Federal Rule 404 is subject to the "substantially outweighs" analysis of Federal Rule 403. *Id.* at 691. "As a consequence, Virginia's rule, as written, makes the introduction of other crimes evidence more difficult than it is under the federal rules." Jeffrey Bellin, *The Virginia and Federal Rules of Evidence: A Concise Comparison with Commentary* 28-29 (2015).

For the most part, this Court has faithfully applied the "incidental prejudice" standard required by Rule 2:404(b). *See, e.g.*, *Jordan v. Commonwealth*, 84 Va. App. 446, 469 (2025); *Flowers v. Commonwealth*, 84 Va. App. 143, 156 (2025); *Carolino v. Commonwealth*, 79 Va. App. 170, 184 (2023) (en banc), *rev'd on other grounds*, 303 Va. 399 (2024). We have also explicitly recognized that the "incidental prejudice" standard is "marginally stricter than the balancing test for prejudice used to evaluate the admission of relevant evidence generally." *Drexel v. Commonwealth*, 80 Va. App. 720, 741 n.6 (2024).

Still, a couple of our published cases have failed to differentiate between the two tests, suggesting incorrectly that the "substantially outweighs" standard in Rule 2:403(a) supplies the balancing test required by Rule 2:404(b). *See Conley v. Commonwealth*, 74 Va. App. 658, 673 (2022); *Kenner v. Commonwealth*, 71 Va. App. 279, 296 (2019), *aff'd on other grounds*, 299 Va. 414 (2021). Some of our nonprecedential opinions have made the same mistake.[11] We clarify

---

[11] *See Gusler v. Commonwealth*, No. 0790-23-3, slip op. at 4, 2024 Va. App. LEXIS 352, at *5 (June 18, 2024); *White v. Commonwealth*, No. 1746-22-3, slip op. at 8, 2024 Va. App. LEXIS 188, at *12 (Apr. 9, 2024); *Moore v. Commonwealth*, No. 0724-22-3, slip op. at 12, 2023 Va. App. LEXIS 406, at *16 (June 20, 2023); *Hirschberg v. Commonwealth*, No. 0203-22-1, slip op. at 7, 2022 Va. App. LEXIS 654, at *9-10 (Dec. 20, 2022); *Hairston v. Commonwealth*, No. 0282-17-3, slip op. at 7-8, 2018 Va. App. LEXIS 93, at *11 (Apr. 10, 2018).

here that Rules 2:403(a) and 2:404(b) provide distinct balancing tests. Courts and practitioners alike should be careful to distinguish them in line with binding Supreme Court precedent and the text of the rules themselves.

      *B. The trial court did not err by admitting evidence of the first two robberies.*

Williams does not dispute that the Commonwealth's evidence of the first two Dollar General store robberies was relevant to show his "identity" as the perpetrator and to show that the Charles City robbery was "part of a common scheme or plan." Va. R. Evid. 2:404(b). A "'common scheme' describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person . . . as part of a pattern of criminal activity involving certain identified crimes." *Brooks v. Commonwealth*, 73 Va. App. 133, 142-43 (2021) (quoting *Scott v. Commonwealth*, 274 Va. 636, 644 (2007)). "The possible range of idiosyncratic features that may prove a 'common scheme' is very broad." *Id.* at 143 (quoting *Scott*, 274 Va. at 647). "[O]ffenses may be considered parts of a common scheme . . . when they are 'closely connected in time, place, and means of commission.'" *Walker v. Commonwealth*, 289 Va. 410, 416 (2016) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 229 (1992)).

The cellphone-location data put Williams near all three robberies when they were committed, all within the span of ten days in three adjoining localities. The perpetrator in each robbery was, like Williams, a tall, slender, Black male who was masked and armed with a handgun. He executed a common scheme each time, entering the store, confronting one or more employees, brandishing his gun, and ordering them to put cash from the register in store bags. As in the Charles City robbery, the perpetrator in the Williamsburg robbery ordered bystanders to hold their hands flat on surfaces, rather than to lie on the ground or to put their hands in the

- 14 -

air.  Given that Williams's main defense was that he did not rob the Charles City store, the evidence of the two prior robberies was highly probative to show his identity as the robber.

We reject Williams's suggestion that the evidence of the prior robberies was inadmissible because Williams was not convicted of those crimes and it was not proven that he was the robber.  Both the United States Supreme Court and our Supreme Court have held that the admissibility of prior bad acts does not require proof beyond a reasonable doubt that the defendant committed them.  *Prieto v. Commonwealth*, 283 Va. 149, 172 (2012) (citing *Huddleston*, 485 U.S. at 690).  Rather, the trial court "simply examines all the evidence in the case and decides whether the jury could reasonably find [that the prior act took place]."  *Id.* (alteration in original) (quoting *Huddleston*, 485 U.S. at 690).  As *Prieto* noted, *id.*, we adopted that standard in 1998.  *See Pavlick v. Commonwealth*, 27 Va. App. 219, 227 (1998).  That standard was easily satisfied here.

Although the balancing test to exclude prior-bad-act evidence as prejudicial is easier to satisfy under Rule 2:404 than 2:403, we find no abuse of discretion in the trial court's conclusion that the probative value of that evidence here outweighed the incidental prejudice.  Given that all incriminating evidence "is prejudicial to an accused," the fact that prejudice results does not "justify automatic exclusion."  *Jordan*, 84 Va. App. at 469 (quoting *Mayfield v. Commonwealth*, 59 Va. App. 839, 849 (2012)).  "The responsibility for balancing the two considerations rests in the trial court's discretion and we will not disturb the trial court's determination in the absence of a clear abuse of discretion."  *Kenner*, 299 Va. at 427.  When, as here, "a course of criminal conduct . . . consist[s] of a series of related crimes, the perpetrator has no right to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial."  *Jordan*, 84 Va. App. at 470 (alteration in original) (quoting *Kenner*, 299 Va. at 426-27).

What is more, "[t]he danger of unfair prejudice can . . . be mitigated by an instruction to the jury that limits their consideration of other crimes evidence to its proper purposes and application to each offense charged." *Brooks*, 73 Va. App. at 148. The trial court here instructed the jury that it could consider the other-crimes evidence "only" as "evidence of the defendant's identity" or "the unique nature of the method of committing the crime . . . for which he is on trial and for no other purpose." We presume that juries heed such instructions. *Bryant v. Commonwealth*, 295 Va. 302, 311 (2018). The fact that the trial court gave that limiting instruction further supports our conclusion that the court did not abuse its discretion by admitting evidence of the two prior robberies to show that Williams was the masked gunman in the Charles City robbery. *Accord Jordan*, 84 Va. App. at 470-71 (citing the trial court's limiting instruction to show that the court properly exercised its discretion); *Osman v. Commonwealth*, 76 Va. App. 613, 641 (2023) (same).

### C. The cellphone evidence was properly admitted.

As described above, the Commonwealth relied on evidence from Williams's cellphone to build its case against him. Williams moved *in limine* to exclude that evidence on the ground it was "unnecessary to the disposition of this case" and highly prejudicial. Williams asked the trial court to "completely exclude the cellphone evidence" because "the phone was not seized from [his] person." Williams repeats those arguments here. The Commonwealth counters that there was "ample circumstantial evidence that Williams possessed the phone" during the robberies. We agree with the Commonwealth.[12]

---

[12] As the parties agreed at oral argument, the admissibility of the phone evidence concerning the two prior robberies is governed by the "incidental prejudice" test in Rule 2:404(b), while the evidence relating to the Charles City robbery is governed by the "substantially outweighs" test in Rule 2:403(a).

The phone was found in the black Hyundai Sonata alongside other papers belonging to Williams. The T-Mobile records showed that the phone was registered to Williams. The text messages, photographs, and internet queries found on the phone pointed to Williams as the owner. The cellphone-location records traced the robber's movements each time from near Williams's residence in Hampton to each of the Dollar General stores and back again. An outgoing message correctly listed Williams's name, social security number, and cellphone number. The phone held pictures of Williams with his son. Shortly after the shootout at the Charles City store, an outgoing text to one contact said, "shit went down today, shells flying type shit." Two days later, an outgoing text to "Mommy," whose telephone number was that of Williams's mother, said that "sum serious shit" had happened. The user searched the address of the Charles City store about an hour before it was robbed. The phone's search history showed that the user accessed nearly a dozen news articles about the Charles City robbery. The user also made incriminating internet queries about the likelihood of getting caught for stealing while wearing a mask. And the photos stored on the phone showed Williams in clothing like the clothing worn by the gunman.

In short, we find no abuse of discretion in the trial court's determination that the probative value of the phone evidence in showing that Williams was the gunman who committed the crimes at the Charles City store far outweighed the danger of unfair prejudice.

D. *The trial court did not err in denying Williams's motion to strike.*

Finally, we reject Williams's claims that the Commonwealth failed to prove that Williams committed the crimes for which he was charged and convicted. "[T]he 'relevant issue on appeal is, "upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Tatusko v. Commonwealth*, 79 Va. App. 721, 736 (2024) (quoting *Lambert*

*v. Commonwealth*, 298 Va. 510, 515 (2020)). The "analysis 'does not distinguish between direct and circumstantial evidence, as the fact finder itself "is entitled to consider all of the evidence, without distinction, in reaching its determination."'" *Walker v. Commonwealth*, 79 Va. App. 737, 743 (2024) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26-27 (2021)). Circumstantial evidence "is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* at 744 (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).

Most of Williams's arguments here hinge on his claim that the Commonwealth failed to prove that he was the masked gunman who robbed the Charles City store. For instance, that is the only ground on which he challenges his convictions for robbery resulting in serious bodily injury, the use of a firearm to commit attempted aggravated murder, and the use of a firearm to commit aggravated malicious wounding.

But as described above, the Commonwealth produced a mountain of circumstantial evidence to prove that Williams was the masked gunman at the Dollar General store in Charles City. We have already described the cellphone-location data and cellphone evidence from which the trier of fact could conclude beyond a reasonable doubt that the robber was Williams. In addition, Williams's DNA was found on one of the distinctive red, gray and black work gloves that matched the gloves worn by the robber. All of that evidence, considered in its entirety, sufficed to exclude the hypothesis that someone other than Williams committed the crimes at the Charles City store.

Williams's challenges to the remaining convictions fare no better. Williams says the evidence failed to prove attempted aggravated murder because the gunman fired his weapon only to flee the scene, not to kill Deputy Buchanan. He claims there was no evidence of

premeditation.[13]  "Determining intent is 'generally a question for the trier of fact.'"  *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)).  "[E]vidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction."  *Jackson v. Commonwealth*, 267 Va. 178, 204 (2004).  In determining whether premeditation existed, "the jury may properly consider the brutality of the attack," *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)), including whether the victim was shot multiple times at close range. *See, e.g.*, *Bailey v. Commonwealth*, 259 Va. 723, 749 (2000) (finding premeditation where the defendant walked into a bedroom and shot the victim "twice in the head at close range").

Viewing the evidence in the light most favorable to the Commonwealth, the jury had ample basis to conclude that Williams intended to kill Deputy Buchanan.  She stood in his way of escaping the crime scene.  When he first encountered her, Williams ordered, "hands down, hands down," before firing multiple times in the shootout that followed.  Those were not warning shots.  An image from the store security camera shows Williams pointing his gun directly at Buchanan as she tried to avoid being hit.  She was unsuccessful.  One round struck her in the back, piercing her bullet-proof vest.  Because a rational trier of fact could conclude that Williams shot Buchanan with the intent to kill her, the trial court did not err in denying his motion to strike the attempted aggravated murder charge.

---

[13] Under Code § 18.2-31(6), aggravated murder is "the willful, deliberate, and premeditated killing of a law-enforcement officer . . . when such killing is done for the purpose of interfering with the performance of his official duties."  "An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission."  *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)).  Thus, to prove attempted aggravated murder, the Commonwealth had to show that Williams intended to kill Deputy Buchanan and that he took an overt act toward doing so.

We also reject Williams's argument that he could not be convicted of aggravated malicious wounding on the ground that Deputy Buchanan did not "suffer permanent and significant physical impairment." Code § 18.2-51.2(B). To be sure, "the injuries inflicted on the victim must be both a 'significant physical impairment' and 'permanent.'" *Alston v. Commonwealth*, 77 Va. App. 639, 650 (2023) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)). But physical impairment means "any physical condition, anatomic loss, or cosmetic disfigurement." *Id.* (quoting *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995)). "[T]he Commonwealth need not present definitive testimony that a victim's injuries will never improve"; it is left "to the common sense of the [factfinder] to determine if the injuries are permanent." *Id.* at 644-45. In *Newton*, for example, we found sufficient evidence of a permanent injury from a razor-blade attack because the victim's facial scar was "obvious and visible" just "five months after," and a scar on his ear was also still visible. 21 Va. App. at 90. We said that the factfinder "reasonably could have found from the number of wounds, the need for stitches for some of them, and the resulting scars, still visible after five months, that [the victim]'s injuries constituted 'permanent and significant physical impairment.'" *Id.* Likewise, Deputy Buchanan testified that Williams's shooting her in the back has left a scar, and photographs of the large scar were introduced into evidence. She also continues to experience back spasms that require chiropractic visits to ease her suffering, spasms that will continue indefinitely. That evidence sufficed to prove aggravated malicious wounding.

CONCLUSION

We find no basis to disturb Williams's convictions.

*Affirmed.*