# COURT OF APPEALS OF VIRGINIA

## Record No. 0074-25-2

LESTER WAYNE CHINAULT

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Beales, O'Brien and Ortiz

Opinion Issued May 12, 2026[*]

**FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY**
B. Elliott Bondurant, Judge

(Charles E. Haden, on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; S. Hallie Hovey-Murray, Assistant Attorney General, on brief), for appellee.

## MEMORANDUM OPINION
## PER CURIAM

Following a jury trial on January 2, 2025, the circuit court convicted Lester Wayne Chinault of possessing a firearm as a convicted felon in violation of Code § 18.2-308.2. On January 8, 2025, the circuit court sentenced him to five years of incarceration. On appeal, Chinault argues that the circuit court erred by denying his motion to strike and by denying his motion *in limine* seeking to exclude certain evidence.[2]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

BACKGROUND

"On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,' the prevailing party below." *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)). "That principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

In March 2024, Virginia State Police Trooper Dylan Coleman opened an investigation into an unrelated matter. As a part of that investigation, Trooper Coleman testified that he obtained "information that le[]d me to believe that Mr. Chinault was in possession of firearms." This information concerned Trooper Coleman because he "knew that Mr. Chinault was a violent felon and a Disciples gang member." Trooper Coleman obtained a search warrant for Chinault's residence, where Chinault lived with a woman named Desiree Campbell and her three children.[3] Along with other law enforcement officers, on March 29, 2024, Trooper Coleman executed a search warrant for the residence. The police detained Chinault and Campbell and placed them in the back of separate police vehicles.

After giving Chinault his *Miranda*[4] warnings, and after Chinault agreed to speak with him, Trooper Coleman spoke with Chinault. During their conversation, Trooper Coleman informed Chinault that he had three outstanding "arrest warrants for the registry violations" and explained that he had a search warrant for the residence based on a suspicion that Chinault was in possession of firearms. Chinault initially denied that there was a firearm in the residence.

---

[3] Trooper Coleman obtained the address from Chinault's entry on the sex offender registry.

[4] *Miranda v. Arizona*, 384 U.S. 436, 498-99 (1966).

Trooper Coleman told Chinault that he knew there was a firearm in the house and that he should tell him where it was so that he did not have to search the entire house. Chinault then told Trooper Coleman that he would tell Coleman "where the firearm was inside the house" if Trooper Coleman agreed to give "him a cigarette and socks." Trooper Coleman then gave Chinault "his vape pen" and socks, and Chinault told Trooper Coleman that there was a loaded firearm "underneath of his dresser in the bedroom with the safety on." Although the room was messy, Chinault was able to point Trooper Coleman to the location of the firearm. The firearm was a Kimber Model Ultra Carry 2 caliber 45 pistol. Chinault repeatedly admitted that he had possession of the firearm but stated "that he was holding it for someone" who "was locked up" named Dustin Hearing. However, when confronted with additional evidence, he instead said that he had obtained the firearm from a different individual.

The officers sent the firearm to the Department of Forensic Science for testing. Analysis of the firearm concluded that it was "in mechanical operating condition" and that there were two fingerprints on the magazine that matched Chinault's fingerprints.

Following his arrest, Chinault continued to stay in contact with Campbell. Campbell testified that she and Chinault exchanged phone calls and letters. After Campbell told Chinault that she had been served with a subpoena to testify, she received two letters, one of which was addressed to her youngest son. The letters were purportedly from someone named "Michael Moore," but Campbell testified that she recognized the handwriting as belonging to Chinault. In addition, she testified that she did not know anyone named Michael Moore. She also testified that she and Chinault had known each other for 19 years and that she had other opportunities to review Chinault's handwriting before she received the letters at issue here. In one of the letters, "Michael Moore" apologized for the subpoena and told her that she was "the only one that can get me time." The letter instructed Campbell to testify that the person who wrote the letter "was

sleeping in the living room" while he was living with Campbell and to further testify that he was only supposed to be in the residence "for weekends to make sure that our son[5] got his meds so you can work on the weekends." The letter further instructed Campbell to testify that she had "never seen me handle the gun that they had." When Campbell received the letters, she placed them in her car and called the Commonwealth's Attorney's Office. Campbell turned over copies of the letters to the Commonwealth's Attorney's Office. After she received the initial letters, Campbell received other letters with similar content and requests.

Before the beginning of Chinault's jury trial, his counsel moved *in limine* to exclude the letters. He argued that the letters did not constitute admissions of guilt, that they would only be admissible if Chinault testified, that they may have been written by someone else, and that they were irrelevant and highly prejudicial to him. The Commonwealth responded that the letters would be admissible as party admissions and that the letters were at least relevant to show Chinault's "knowing and intentional possession" of the firearm. After reviewing the letters, the Court denied the motion *in limine* "on the condition that a proper foundation . . . be laid."

At trial, Campbell testified that she and Chinault shared a bedroom. Although they had previously been romantically involved, they were not currently romantically involved. Campbell described Chinault as a father-like figure to her children. Campbell testified that some of Chinault's possessions were in his truck, but he had "a few things in the house." When shown the firearm recovered from her house, Campbell identified the firearm as belonging to Chinault and stated that he was the one who brought the firearm into the house. She testified that, at times, Chinault would keep the firearm on his person. Campbell witnessed Chinault handling the firearm more than twice.

---

[5] Campbell testified that Chinault was not the father of any of the children who lived with her. She explained that Chinault "calls all of my children his children."

- 4 -

At the close of the Commonwealth's case-in-chief, Chinault moved to strike arguing that the evidence was insufficient to support a conviction. The circuit court denied the motion. After Chinault decided not to testify, Chinault's counsel renewed his motion to strike, and the circuit court again overruled that motion. After deliberating, the jury convicted Chinault. Chinault now appeals to this Court.

ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (emphasis in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Bowman v. Commonwealth*, 290 Va. 492, 496-97 (2015) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

"Code § 18.2-308.2 prohibits the possession of firearms by convicted felons." *Jordan v. Commonwealth*, 286 Va. 153, 157 (2013). By its terms, this statutory provision requires that the Commonwealth establish that the defendant knowingly and intentionally possessed the firearm. *Murray v. Commonwealth*, 71 Va. App. 449, 461 (2020). Either actual or constructive possession are sufficient to establish possession. *See Bolden v. Commonwealth*, 275 Va. 144, 148 (2008).

Here, the record contains plenty of evidence that Chinault knowingly and intentionally possessed a firearm, including his admissions to law enforcement, the fact that the firearm was

found under the dresser in the bedroom where he was living, the fact that he directed Trooper Coleman to where the firearm was located and knew that it was loaded and that the safety was on, the fact that his fingerprints were on the ammunition magazine, and the testimony of Campbell (who saw him possess the firearm). Given all of this evidence, the circuit court did not err in denying Chinault's motion to strike. *See Murray*, 71 Va. App. at 461 (concluding that there was sufficient evidence of knowing and intentional possession of a firearm recovered from a vehicle when the defendant was the only person in the vehicle, admitted that she knew the firearm was in the vehicle, ran from the police, and said that she was transporting the firearm to its owner); *Bolden*, 275 Va. at 148 (recognizing that the evidence in the record supported the finding that the defendant "was aware of the presence and character of the firearm and it was within his dominion and control"); *Archer v. Commonwealth*, 26 Va. App. 1, 13 (1997) ("The only reasonable hypothesis flowing from the evidence in this case is that appellant was aware of the presence of the gun beneath the mattress and that it was subject to his dominion and control.").

Chinault also contends that the circuit court committed reversible error in denying his motion *in limine* to exclude certain letters purportedly written by him to Campbell. "This Court reviews a [circuit] court's ruling admitting or excluding evidence for abuse of discretion." *Murray*, 71 Va. App. at 456 (alteration in original) (quoting *Payne v. Commonwealth*, 292 Va. 855, 866 (2016)); *see Thomas v. Commonwealth*, 44 Va. App. 741, 757-58 (2005) ("We generally defer to trial judges on" whether evidence "should have been excluded as unduly prejudicial" because trial judges "participate first person in the evidentiary process and acquire competencies on the subject that we can rarely duplicate merely by reading briefs and transcripts.").

Here, the circuit court did not abuse its discretion in admitting the letters. *See Paden v. Commonwealth*, 259 Va. 595, 597 (2000) (concluding that a letter from a jailed defendant to a codefendant seeking to establish an alibi was admissible because "[e]xtra-judicial admissions that tend to show guilt, even if not confessions, are admissible as party admissions"). The record does not suggest that the circuit court was wrong to conclude that the probative value of the letters outweighed any unfair prejudice to Chinault. *See Thomas*, 44 Va. App. at 758-59 (affirming conviction); *see also Fields v. Commonwealth*, 73 Va. App. 652, 679 (2021) (affirming conviction because "the purportedly unfair prejudicial effects of the admitted phone calls are not so apparent and substantial that reasonable jurists would all agree that the probative value of the evidence was substantially outweighed by the prejudicial nature of its content").

Moreover, although Chinault argues that he never wrote the letters, "[a]uthentication does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be." *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012)). Given Campbell's testimony that she was familiar with Chinault's handwriting and recognized that the letters were from him, and given that facts recounted in the letters and requests made in the letters appeared to come from Chinault, the letters were properly authenticated and admitted by the circuit court. *See Jackson v. Commonwealth*, 13 Va. App. 599, 603 (1992) (stating that "[h]andwriting evidence is testimony by expert witnesses and by lay witnesses familiar with the handwriting of the person involved").[6]

---

[6] We note, for the sake of completeness, that even if the circuit court's decision to admit the letters were erroneous, this error would be a harmless error, given the overwhelming evidence of Chinault's guilt. *See Dalton v. Commonwealth*, 64 Va. App. 512, 518-21 (2015) (holding that the admission of text messages constituted harmless error because they were "cumulative of otherwise overwhelming evidence admitted at trial"); *Rose v. Commonwealth*, 270 Va. 3, 12 (2005) (concluding "that the circuit court's decision to admit evidence of the prior crime was indeed harmless error" because "[t]he evidence of Rose's guilt is overwhelming").

CONCLUSION

Therefore, for all of these reasons, we affirm the circuit court's judgment.

*Affirmed.*